**In re Larry L. MARTIN, Niki W. Martin, Heart L Ranch Company, Debtors.**

**Bankruptcy Nos. 285–00537, 285–00538.**

United States Bankruptcy Court, D. Montana.

Oct. 31, 1986.

John W. Larson, Helena, Mont., for debtors.

Leonard Schultz, Dillon, Mont., for John Hancock Ins. Co.

## ORDER

JOHN L. PETERSON, Bankruptcy Judge.

In this Chapter 11 proceeding, hearing on the Debtors' proposed Second Amended Plan of Reorganization was held on September 15, 1986, after 25 days' notice to all creditors and parties in interest. Ballots of creditors to the Plan of Reorganization filed with the Court are as follows:

| Class | | Creditor | Amount | Vote |
|---|---|---|---|---|
| 1. | Priority | Madison County | None stated | Accepts |
| 3. | Secured | John Hancock Mutual Life Ins. Co. | $2,009,219.06 | Rejects |
| 4. | Secured | Norwest Bank | 178,894.57 | Accepts |
| 5. | Secured | Navistar Financial Corp. | 79,758.00 | Accepts |
| 7. | Unsecured | Veterinary Hospital | 1,193.80 | Accepts |
| | | Montana Motor Supply | 1,224.95 | Accepts |
| | | Neil, Williamson, Eide & Stakker | 2,329.90 | Accepts |
| | | C & C Farm & Ranch Supply | 2,809.45 | Accepts |
| | | Vigilante Electric Cooperative Assn. | 1,824.02 | Accepts |
| | | Brown & Thompson Oil Co. | 19,163.44 | Accepts |
| | | Montana Agri Chemical, Inc. | 31,723.18 | Accepts |
| | | Olive Logan | 44,179.42 | Accepts |

Creditors in Classes 3, 4, 5 and 7 are impaired under the Plan in that their legal rights are altered by the provisions of the Plan. Olive Logan in Class 7 is an insider being a stockholder of the Debtors. Classes 4, 5 and 7 (exclusive of the insider Logan) have affirmatively voted to accept the Plan, thus satisfying the provisions of Section 1129(a)(10) of the Bankruptcy Code that at least one class of claims that is impaired under the Plan has affirmatively accepted the Plan, determined without including any acceptance of the Plan by an insider. 5 *Collier on Bankruptcy*, Sec. 1129.02, P. 1129–36.9/36.10 (15th Ed.).

The Debtors have been engaged for 16 years in farming and ranching near Twin Bridges, Montana, on a 7,534 acre operation. Heart L Ranch Company is a corporation controlled by Larry and Nikki Martin. The Debtors' operation includes producing crops of wheat, hay, malt barley, straw and raising livestock. The ranch lands are classified as follows:

| | | |
|---|---|---|
| Sprinkler irrigated cropland | - | 840 acres |
| Irrigated and sub pasture | - | 120 acres |
| Dry cropland | - | 2,788 acres |
| Seeded dry cropland | - | 1,547 acres |
| Native rangeland | - | 2,239 acres |
| | | 7,534 acres |

In addition, the Debtors own a one-sixth interest in the Garden Creek Grazing Association equal to about 4,160 deeded acres which is used for summer grazing of cattle. An appraisal of the property introduced by the Debtors' appraiser, and not contested by any party in interest, values the land and building improvements at $2,700,000.00 as a going concern fair market value. The appraiser further testified that in the event of forced liquidation, the property would bring 30% to 50% less. In the Debtors' Disclosure Statement, the value of farm machinery is fixed at $356,000.00. The Debtors presently run 500 mother cows as part of its cow-calf crop operation. The largest crop production is from barley, and the historic records of the ASCS for the years 1981 to 1984 show an annual average yield of 44.25 bushels per acre from the dryland and 90 bushels per acre from the irrigated land. Wheat production is generated from 665 acres of irrigated land, which has produced on an historic basis about 75 bushels per acre annually.

Objections to the Amended Plan of Reorganization were filed by John Hancock Mutual Life Insurance Company, the largest secured creditor. The John Hancock loan was made to the Debtors on March 26, 1984, based on a promissory note of $1,600,000.00, payable annually at 13% interest in increments of $105,296.00 each January 1 and July 1, until July 1, 1991, when a balloon payment of $1,571,789.59 was due. No payments have been made on the loan by the Debtors pre-petition. John Hancock brought a foreclosure action, which culminated in a state court entering a decree of foreclosure on October 22, 1985. Under the terms of that decree interest accrues on the judgment of $1,982,-424.16 at 16% per annum, being the default rate of interest under the note. The Debtors' Proposed Plan of Reorganization seeks to restructure the John Hancock debt by paying the indebtedness over a period of 20

years in annual installments of $226,960.00 at a 9.5% interest rate. Hancock claims such proposal unfairly discriminates against it under circumstances where other secured creditors, Norwest Bank, Sperry Hew Holland, International Harvester and Navistar Financial Corporation, will all be paid in full under the Plan by 1990, while Hancock will be "held captive" until the year 2007. Further, Hancock attacks the feasibility of the plan, contending the forecasted statement of cash flow is unrealistic and unsubstantiated based on historical data. Hancock argues that the Debtors own evidence shows that in the year 1987–88 income will fall short of expenses by $42,950.00, thus showing that the Debtors' Plan does not satisfy the provisions of Section 1129(a)(11). The Debtors have requested the Court to implement the provisions of Section 1129(b) of the Code, the so-called cram down provision, against John Hancock.

■ Certain principles dealing with confirmation of a Chapter 11 Plan are well established. Regardless of whether a valid objection to confirmation has been asserted, the Code imposes upon the Court the responsibility and duty to determine whether the requirements of Section 1129(a) have been met. As stated in *In Re Holthoff*, 58 B.R. 216, 218 (Bankr.E.D.Ark.1985):

"In addition to the consideration of objections raised by creditors, the Court has a mandatory independent duty to determine whether the Plan has met all of the requirements necessary for confirmation. *In Re Costal Equities, Inc.*, 33 B.R. 898 (Bankr.S.D.Cal.1983); *In Re White*, 41 B.R. 227 (Bankr.M.D.Tenn.1984); *Matter of Nikron, Inc.*, 27 B.R. 773 (Bankr.E.D. Mich.1983)."

Further, as held in *In Re Prudential Energy*, 58 B.R. 857, 862 (Bankr.S.D.N.Y.1986):

"[D]ischarging this responsibility does not entail investigation of the Debtor. But it does require the Court to require sufficient documentation to be submitted and to ask appropriate questions concerning the requirements of Section 1129(a)."

■ Clearly then, confirmation may not be allowed without full satisfaction of each of the requirements of section 1129(a) and (b), and on this issue, the Debtors have the burden of proof. *In Re Prudential Energy*, Id. at 862. Moreover, the court must hold, and the Debtor must submit testimony at an evidentiary hearing, before ruling on confirmation. As held in *In Re Acequia*, 787 F.2d 1352, 1358 (9th Cir.1986):

"The Bankruptcy Court must hold an evidentiary hearing in ruling on confirmation. See e.g., *Technical Color & Chemical Works, Inc. v. Two Guys From Massapequa, Inc.*, 327 F.2d 737, 742 (2nd Cir.1964); *In Re Aminex Corp.*, 15 B.R. 356, 358, n. 4 (Bankr.S.D.N.Y. 1981). See also Bankr. R. 3020(b)(2). But this does not preclude the Bankruptcy Court from considering evidence presented by the parties at prior evidentiary hearings. See, e.g., *In Re Graco, Inc.*, 364 F.2d 257, 260 (2nd Cir.1966)."

■ The Plan must be feasible, that is, confirmation of the Plan under Section 1129(a)(11) is not likely to be followed by liquidation or the need for further reorganization of the Debtors. *In Re Prudential Energy*, supra, holds at 862–63:

"Guaranteed success in the stiff winds of commerce without the protection of the Code is not the standard under 1129(a)(11). Most Debtors emerge from reorganization with a significant handicap. But a plan based on impractical or visionary expectations cannot be confirmed. (Citing cases and authority). All that is required is that there be a reasonable assurance of commercial viability. *In Re Trail's End Lodge*, 54 B.R. [898] at 904 [Bankr.Vt.1985]."

Further, *In Re Clarkston*, 767 F.2d 417, 420 (8th Cir.1985), states:

" * * * The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts. *In Re Bergman*, 585 F.2d 1171, 1179 (2nd Cir.1978) (quoting 9 *Collier on Bankruptcy* at 1139). Pertinent factors to be considered include the business's earning power, the sufficiency of

the capital structure, economic conditions, managerial efficiency, and whether the same management will continue to operate the company. *In Re Great Northern Protective Services, Inc.*, 19 B.R. 802, 803 (Bankr.W.D.Wash.1982)."

In *In Re Acequia, Inc.*, supra at 1364, the Court alluded to Section 1129(a)(11) in this manner:

"Finally, we find that the Plan satisfies the 'feasibility' requirement of 11 U.S.C. Section 1129(a)(11) (1982). The debtor presented ample evidence to demonstrate that the plan has a reasonable probability of success. *See generally In Re Merrimack Valley Oil Co.*, 32 B.R. 485, 488 (Bankr.Mass.1983). The debtor provides both 'conservative' and 'best case' projections. The debtor's experts testified that the debtor's assets are attractive and in demand. That the plan provides for eventual liquidation of assets does not preclude confirmation. 11 U.S.C. Section 1123(a)(5)(D) (1982); *In Re Costal Equities, Inc.*, 33 B.R. 898, 904 (Bankr.S.D. Cal.1983). We do not agree with Clinton's assertion that the plan is a 'visionary scheme', *In Re Pizza of Hawaii*, 761 F.2d [1374] at 1382 (9th Cir.1985). (Quoting 5 *Collier* 15th, supra, P. 1129.02 at 1129–34) and we find no abuse of discretion in the bankruptcy court's determination that the plan is feasible."

▮ Before I address the evidence in this case dealing with the feasibility or reasonable probability of success of the plan, the application of the cram-down provisions of 1129(b) should be related so as to put all of the findings based on the evidence in proper perspective. *In Re Acequia*, supra at 1363–64 holds:

"11 U.S.C. Section 1124(b) provides that an interest is impaired unless the plan 'leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder of such claim or interest.' * * * The impairment provision of Section 1124(1) requires an examination of each interest to determine whether the plan alters the legal, eq-

uitable or contractual rights of the holders of that interest."

Clearly, and the Debtors do not contend otherwise, John Hancock is an impaired, secured creditor under the Plan. Since Hancock does not consent to the Plan, as have the other secured and unsecured creditors, the Debtors are thus left with no option but to request the application of the Section 1129(b) cram-down provisions.

*Acequia* continues, id. at 1363–64:

"11 U.S.C. Section 1129(b) provides that if a plan meets all of the requirements for confirmation other than impairment, the court may confirm the plan 'if the plan does not discriminate unfairly', and is fair and equitable with respect to each class of claims or interests that is impaired under, and has not accepted, the plan. 11 U.S.C. Section 1129(b)(1) (1982).

\*    \*    \*    \*    \*    \*

The terms 'does not discriminate unfairly' and 'fair and equitable' connote definite meanings within reorganization cases. Specifically, the concept of unfair discrimination applies to plans in which claims or interests have been subordinated. See Sponsors' Remarks, 124 Cong. Rec. H11, 104 (daily ed. Sept. 28, 1978) (statement of Red. Edwards); 124 Cong. Rec. S17,420 (daily ed. Oct. 6, 1978) (statement of Sen. DeConcini). The Collier treatise states that this provision requires that a plan 'allocate[ ] value to the class in a manner consistent with the treatment afforded to other classes with similar legal claims against the debtor.' 5 *Collier* 15th, supra P. 1129.03, at 1129–50. See also 3 *Norton*, supra Section 63.21, at 25. Similarly, the Code provides specific examples of when a plan is 'fair and equitable' in the treatment of equity security holders. 11 U.S.C. Section 1129(b)(2)(B) (1982). *See In Re Toy & Sports Warehouse, Inc.*, 37 B.R. [141] at 147–48 [Bankr.S.D.N.Y.1984]; Klee, *All You Ever Wanted to Know About Cram Down Under The New Bankruptcy Code*, 53 Am.Bankr.L.J. 133, 148–56 (1979)."

The fair and equitable test adopts the absolute priority rule established in *Northern Pacific Railway v. Boyd,* 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 (1913). *In Re Ahlers,* 794 F.2d 388, 403 (8th Cir.1986) defines such rule as follows:

"Simply stated, the absolute priority rule provides that a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property under the plan."

As to secured creditors, the plan may be confirmed under 1129(b)(2)(A)(i) if the secured creditor retains a lien securing the amount of its allowed secured claim and it receives deferred cash payment having a present value, as of the effective date of the plan, equal to the present value of the collateral. *Ahlers,* at 401. Moreover, the allowed secured claim must equal the value of the collateral at the time the plan is confirmed. 11 U.S.C. 506(a). In that regard, "application of the test under [11 U.S.C. 1129(b)(2)(A)] also requires a valuation of the consideration as of the effective date of the plan" and

"[T]his contemplates a present value analysis that will discount value to be received in the future; of course, if the interest rate paid is equivalent to the discount rate used, the present value and full future value will be identical. Normally, the interest rate used in the plan will be prima facie evidence of the discount rate because the interest rate will reflect an arms length determination of the risk of the security involved and feasibility considerations will tend to understate interest payments." H.R.Rep. No. 595 at 414–15, 1978 U.S.Code Cong. & Ad.News at 6370–71; *In Re Ahlers,* supra, at 401, ft. 15.

In the case *sub judice,* the value of the land securing Hancock's note is uncontested and as of the present time such value exceeds the amount of the debt. Further, 9.5% interest was established as the present market rate of interest for an agri-cultural loan in the area of the Debtors' property. The bank officer from Norwest Bank stated his lending institution has reduced its loan rate from 13% prevailing in the mid–1980s to 8.5% where there is adequate security for the lender.

As noted in *Acequia,* all provisions of 1129(a) except (a)(8), must be satisfied in a Chapter 11 proceeding in order to invoke the cram-down provisions of 1129(b).[1] Consequently, the proposed plan must satisfy the best-interest-of-creditors test set forth in 1129(a)(7). That subsection insures that each holder of a claim or interest in an impaired class, such as John Hancock, will retain under the Plan not less than such creditor would receive if the Debtor were liquidated under Chapter 7. 1129(a)(7)(A)(ii). Or, by use of 1111(b)(2), (electing class for cram-down provisions), an impaired creditor may elect to circumvent application of the best-interest-of-creditors test by receiving the estimated amount received upon liquidation as determined by the value of the collateral plus any amount recovered on the deficiency after sale as if the creditor possessed a recourse note. The alternative 1111(b)(2) election has not been invoked by John Hancock in this case even though it is a dissenting impaired creditor. The reason for such is obvious. The special treatment provided under 1111(b) for the holder of a secured claim not entitled to recourse against the Debtor applies where the collateral is less than the debt. See, Klee, *All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code,* 53 Amer. Bankr.L.J. 133, 160 (1979). Here, Hancock concedes based on the appraisal of the Debtors that it is an oversecured creditor, and thus it cannot be cashed out for less than its claim. In this case I find the amount of the secured claim of John Hancock is $2,009,219.06, while its collateral has a going concern value of $2,700,000.00.[1] The best-interest-of-creditors test under 1129(a)(7) is satisfied because John Han-

---

1. "Cram down" under 1129(b) requires a "going concern valuation". *Pachulski, The Cram Down and Valuation Under Chapter 11 of the Bank-* *ruptcy Code,* 58 North Carolina Law Review 926 (1980).

cock will retain under the Plan not less than it would receive if the Debtors' collateral were liquidated under Chapter 7. Moreover, under the Plan John Hancock will receive the full value of its claim from the deferred cash payments, assuming the Plan is feasible, does not unfairly discriminate against John Hancock and is fair and equitable.

■ I turn now to the issue of feasibility required by 1129(a)(11), discussed above. The evidence of the Debtors in this case presented cash-flow statements for the years 1986–87 and 1987–88 crop years. Those statements show total income of $690,270.00 (ending 3–31–87) and $566,319.00 (ending 3–31–88). Expenses projected for each like period are $611,276.00 and $609,269.00 respectively, leaving a net cash flow in 1987 of $78,994.00 and a deficiency in 1988 of $42,950.00. Against these projections, Hancock has shown that based on tax returns from 1981 to 1985, the corporation accumulated an operating loss of $557,446.00, without payment of any interest on the John Hancock loan. Hancock further points out that the projected net income for 1986–87 is misleading because the income figures are derived from cattle sales based on calves held over from the 1985 calf crop, and not sold until 1986. In effect the receipts are based on two year calf crop sold in one year. The effect, according to Hancock, unfairly increases the 1986 calf receipts by $106,698. When one year calf crop is sold in 1987–88 for $146,956.00, a net operating loss of $42,950.00 is shown by the Debtors. Thus, John Hancock postures that the Debtors' own figures show operating losses for every year over the time proposed to pay the Hancock loan, and thus the Plan as proposed is financially unworkable. To counter this obvious fact, Debtors respond that the projections in the income statement are conservative, or worst case, being based on federal crop insurance and/or Commodity Credit Corporation loan rates for the crops. For example, the proposed cash flow for barley was based on 25.5 bushels per acre from dryland acreage and 44.25 bushels per acre from irrigated lands, whereas the

historic data from 1981 to 1984 show yields substantially higher, with dryland barley at 44.5 bushels per acre and irrigated lands producing 90 bushels per acre. In addition, wheat production was based on 36.75 bushels per acre, all on irrigated land, and historic figures from ASCS records show actual yields of 75 bushels per acre. What this means is real income versus the projected income will be substantially higher and is summarized as follows:

| | | | |
|---|---|---|---|
| Wheat: | 665 acres @ 75 bushels/acre = | | |
| | 49,875 bushels × $3.30/bu. | = | $164,587.00 |
| | Projected in cash flow statement | − | 80,647.00 |
| | Increase on best case basis | − | $ 83,940.00 |
| Barley: | 2,348.2 dryland acres @ 40 bushels/acre | = | 93,928 bushels |
| | and 98 irrigated acres @ 90 bushels/acre | = | 8,820 bushels |
| | totaling net bushels for sale (2,034 bushels retained for seed) | = | 100,714 bushels |
| | at $3.00/bushel | = | $302,142.00 |
| | Cash flow projection | − | 192,647.00 |
| | Increase on best case basis | − | 109,495.00. |

Thus, the total increase in cash flow for wheat and barley for 1987–88 would be $193,435.00, leaving a net operating profit of approximately $153,435.00, rather than a loss of $42,950.00, in a normal cattle sale year.

A principal reason that the Debtors' projections are realistic is that for the first time in the history of its operation it has qualified for and purchased at a cost of $30,000.00 federal crop insurance on its malt barley and wheat crop which guarantees payment in the event of loss on barley of 2,340 acres at 25.5 bushels per acre at $3.00 per bushel, and a wheat guarantee of 36.75 bushels per acre for 665 acres. The insurance guarantees 75% of the expected crop yields. The significance of such insurance to the Debtors' operation is that in 1985, the Debtors suffered loss of crops from drought, and had no insurance to cover such loss. Thus, the insurance will provide stability of income in the future against abnormal weather and catastrophic conditions. With regard to the drought loss, the Debtors have been approved for a Farmers Home Administration crop disaster loan which determined that the total

gross loss of income to the Debtor in 1985 was $291,278.00, on which the FmHA will loan 75% or $233,020.00 at 5% interest, payable over up to 20 years. Such sum may be used to meet the balloon payment due Norwest Bank in 1990. As further income available to the Debtors, their testimony shows that an additional $29,000.00 to $39,000.00 government payment from ASCS is available in 1987–88. Again, this sum was not included in the present cash income projections. In arriving at the projected income-expense figures, the payment of $226,960.00 per year to John Hancock is included as a cash expenditure. Finally, according to Larry Martin, he has increased the acres available for malt barley production for planting more barley crop, and thus the historic yields are not indicative of the present and future operation. After careful consideration of all matters, I find the income stream projected by the Debtors for normal year operations, coupled with crop insurance benefits to cover catastrophic conditions, provide a reasonable assurance of commercial viability from a management which will continue in control of the operation with adequate operating capital. In sum, the plan is neither visionary nor impractical, and as a practical matter the Plan as proposed can be accomplished. Thus Hancock's debt is capable of being retired in full at the rate of $226,960.00 per year, at a market rate of interest presently prevailing for a fully secured real estate loan. Nor have I ignored in this holding the economic conditions of agriculture. Neither Hancock nor the Debtors have suggested that current farm prices are not true indicators of market conditions within the foreseeable future. Indeed, a noted expert in agricultural economy in Montana presented by Hancock stated that malt barley prices are presently running from $3.50 to $4.40 per 100 weight, or about $1.65 to $2.20 per bushel. He projects barley will not decrease below $1.40 per bushel and winter or spring wheat below $2.10 and $2.35 per bushel, respectively. With government support programs presently in place, the market price of wheat and barley per bushel should be maintained at the prices projected by the Debtors. On cattle prices, the parties are in substantial agreement as to future prices of 70 cents per hundred for steers, 60 cents for heifer calves and 31 cents for cows. I find from the evidence that the economic condition as can now be reasonably assumed to exist in the future, favor the Debtors' projections on prices. The Plan is feasible.

Hancock further objects that the Plan is discriminatory. Hancock argues that the Debtors total indebtedness is about 2.6 million of which over 2 million is owed to Hancock. But, says Hancock, the other secured creditors will be paid off by the year 1990, while Hancock must wait until the year 2007, when in fact, Hancock's original bargain provided the note was to be paid by 1992. How that note was to be paid by 1992 is not explained. As I interpret Hancock's argument, it evidently feels the condition in 1129(b) that Hancock cannot be discriminated against unfairly is violated under the Plan because its note is restructured to a 20 year pay out.

First, I think Hancock has misconstrued the meaning of the phrase unfair discrimination. *Klee*, 53 Am.B.L.J. supra, at 141/142 notes:

"Nothing in the Code aids the determination of whether a Plan 'does not discriminate unfairly' with respect to a dissenting class. The legislative history states that the requirement 'is included for clarity' and applies in the context of subordinated debentures. The requirement is intended to be complimentary to the fair and equitable test and to permit the court to evaluate the complex relationship inherent in the relative priority of classes caused by partial subordination. In a nutshell, if the Plan protects the legal rights of a dissenting class in a manner consistent with the treatment of other classes whose legal rights are intertwined with those of the dissenting class, then the plan does not discriminate unfairly with respect to the dissenting class."

See also *In Re Acequia,* supra, at 1364. There is no subordination of Hancock's interest under the plan under which John Hancock's rights are protected by retention of its first security position in the Debtors' land and improvements, which at this time exceed in value the amount due Hancock, and Hancock will be paid in full under the Plan over a reasonable period of time at a market interest rate presently prevailing for a loan of the type and term proposed under the Plan. Moreover, by reason of the type of secured status of Hancock vis-a-vis the other secured creditors, which have mortgage interests in personal property such as machinery, crops and livestock and have not dissented to the Plan, the Plan properly classified Hancock in a separate class and treats it fairly. The other secured creditors such as Norwest Bank and Navistar, do not have similar legal claims against the Debtor.

"In those cases where the Debtor grants a lender a security interest in personal property or a mortgage lien on real property, the lender's secured claim should be separately classified and thus the lender will be the sole member of a secured class." 5 *Collier on Bankruptcy,* 1129.-03, pp. 1129–53/54 (15th Ed).

See also, 5 *Collier on Bankruptcy,* 1122.-03[6].

█ Finally, Hancock complained that its note and mortgage is unfairly restructured from 7 years to 20 years. The answer to such argument lies in the Code itself which allows such result.

"As one commentary has noted, bankruptcy courts may 'cram down' feasible plans of reorganization under the reorganization provisions (e.g. section 1129) of the new Bankruptcy Code, where such plans seek to achieve restructuring of mortgage debts secured by real estate as follows:

(1) The term of any mortgage debt may be extended;

(2) Payments required by the mortgage debt of either principal or interest may be postponed; and

(3) Deferred or reduced payments of principal or interest may be added to the mortgage balance." *In Re Hollanger Rice Farms, Inc.,* 15 B.R. 35, 47 (Bankr.W.D.La.1981).

See also *In Re Ahlers,* supra, at 402:

"Assuming that the *Ahlers'* reorganization plan proposes that they remain on the farm and continue to use the secured collateral in their farming operation, the plan must, to be confirmed over the dissent of the secured creditors, propose that the secured creditors retain a lien in the collateral securing the amount of their allowed secured claims, and that they receive deferred cash payments having a present value equal to the value of the collateral securing their claims as of the effective date of the plan. 11 U.S.C. Section 1129(b)(2)(A)(i). If the plan also proposes to pay the secured creditors a reasonable rate of interest on their allowed secured claims, the present value and face future value will be identical. See H.R.Rep. No. 595 at 414–15, 1978 U.S.Code Cong. & Ad.News at 6370–71."

The restructuring of Hancock's term of payment is reasonable considering it will retain its lien on the real property as first mortgage holder and, since long term mortgages on real property are normal, the term of 20 years is not unreasonable, particularly when the Plan provides for full payment of its debt on a present value basis. See e.g., *Matter of Sun Country Development,* 764 F.2d 406 (5th Cir.1985); *In Re Pikes Peak Water Co.,* 779 F.2d 1456 (10th Cir.1985).

█ In summary, then, there has been strong opposition to confirmation of the Plan by the holder of the first mortgage on the Debtors' real property, who is retaining such lien and priority position, but whose term of payment is being extended at a market rate of interest. Unsecured creditors and other lienholders have voted in favor of confirmation. Obviously, if the Plan were rejected as urged by John Hancock, the possibility of payment to the other creditors, particularly those unsecured, would be diminished, if not rendered nil.

The opposition by the first lienholder on the real property weighed against the acceptance by other creditors underscores the fact that the most probable means of protection of all interests of creditors is confirmation of the Plan. The duty of this Court, being one primarily of equity, is to protect all creditors' interest, especially those who do not have collateral adequate to protect their repayment of debt, as long as the Code requirements are satisfied by the Plan, which is true in this case. Express Congressional policy in favor of rehabilitation, with attendant protection of secured creditors' interest and bargain, lead this Court to conclude the Debtors' Plan of Reorganization as a going concern satisfies the letter and spirit of the Bankruptcy Code.

I conclude after notice and hearing:

1. That the Plan complies with the applicable provisions of Chapter 11 of the Code;

2. That the proponents of the Plan comply with the applicable provisions of the Code;

3. That the Plan has been proposed in good faith and not by any means forbidden by law;

4. (A) That any payments made or promised by the Debtors for services or costs and expenses in connection with the case, or in connection with the Plan and incident to the case, have been disclosed to the court;

(B) Any such payment made before confirmation is reasonable;

5. (A) Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtors, and appointment to or continuance in such office of such individual, is consistent with the interest of creditors and equity security holders and with public policy;

(B) That Debtors' Plan discloses the identity of any insider that will be employed or retained by the reorganized Debt-ors and the nature of cooperation of such insider;

6. With respect to each class:

(A) Each holder of a claim or interest of such class has accepted the Plan or will receive or retain under the Plan an account of such claim or interest property of a value, as of the effective date of the Plan, that is not less than the amount that such holder would so receive or retain if the Debtors were liquidated under Chapter 7; or

(B) Under Section 1129(b)(2) of the Code, each holder of a claim of such class will receive or retain under the Plan an account of such claim property of a value as of the effective date of the Plan, that is not less than the value of such creditor's interest in the estate's interest in the property that secures such claims;

7. With respect to each class, such class has accepted the Plan and the Plan provides that:

(A) With respect to a claim of a kind specified in Sections 507(a)(1) or 507(a)(2) of the Code, on the effective date of the Plan, the holder of the claim will receive on account of such claim cash equal to the allowed amount of such claim;

(B) With respect to a class of claims of a kind specified in sections 507(a)(3), 507(a)(4), or 507(a)(5) of the Code, each holder of a claim of such class will receive, if such class has accepted the Plan, deferred cash payments of value, as of the effective date of the Plan, equal to the allowed amount of such claim; or, if such class has not accepted the Plan, cash on the effective date of the Plan equal to the allowed amount of such claim; or

(C) With respect to a claim of the kind in Section 507(a)(6) of the Code, the holder of such claim will receive on account of such claim deferred cash payments, over a period not exceeding 6 years after the date of assessment of such claim, of a value, as of the effective date of the Plan, equal to the allowed amount of such claim; or

(D) With respect to each class of secured creditors who are impaired under the Plan

and have not accepted the Plan, the Plan does not discriminate unfairly and is fair and equitable with respect to each class and the Plan complies with Section 1129(b)(2)(A) of the Code;

8. At least one class of claims has accepted the Plan, determined without including any acceptance of the Plan by an insider holding a claim of such class;

9. No regulatory commission with jurisdiction is involved in the Plan;

10. Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtors or any successor debtor under the Plan, unless such liquidation is proposed in the Plan.

IT IS ORDERED the Debtors Second Amended Plan of Reorganization is confirmed.