In re TIMBER TRACTS, INC., Debtor.

Bankruptcy No. 485–00567.

United States Bankruptcy Court,
D. Montana.

Feb. 27, 1987.

Charles W. Hingle, Billings, Mont., for debtor.

## ORDER

JOHN L. PETERSON, Bankruptcy Judge.

In this Chapter 11 proceeding, hearing was held on the Debtor's Plan of Reorganization on October 28, 1986. Ballots received from the creditors are as follows:

| Class | Creditor | Amount | Vote |
|---|---|---|---|
| A Secured | Valley Bank of Helena | $132,560.66 | Rejects |
| B Secured | First Citizens Bank, Billings | 121,880.40 | Accepts |
| C Secured | Cripps | 4,286.14 | Accepts |
| D Secured | Alcorn | 57,659.00 | Accepts |
| E Secured | Adolph | 21,952.00 | Accepts |
| G Secured | Kelley | 24,898.02 | Accepts |
| H Secured | Cook | 43,370.00 | Accepts |
| J Unsecured | Bailey | 6,999.00 | Accepts |
| K Unsecured | Murphy | 40,007.00 | Accepts |
| L Unsecured | Joyner | 5,256.00 | Accepts |
| | Cook | 141,229.00 | Accepts |
| | Brower | 130,363.00 | Accepts |
| | Vallie | 21,451.00 | Accepts |
| | Brower Law Firm | 22,885.84 | Accepts |

Unsecured creditors Brower, Vallie, Cook, Joyner and Brower Law Firm are insiders. Each secured Class A, B, C, D and J are impaired under the proposed Plan, and since Classes B, C, D and J have voted affirmatively to accept the Plan, Section 1129(a)(10) which requires an affirmative acceptance by at least one impaired class, has been satisfied. There are twelve classes of creditors under the Plan and two classes of administrative claims. As noted above, Class A secured creditor Valley Bank of Helena rejected the Plan and also filed objections to confirmation of the Plan, stating that it was not feasible, that such secured creditor would not receive the value under the Plan it would receive upon liquidation and that the Plan is not fair and equitable nor does it satisfy the best interest of creditors test.

The Debtor is a Montana corporation formed in 1972 to engage in the purchase and sale of sub-divided recreational tracts of ten and forty acre parcels in Fergus, Musselshell and Yellowstone County, Montana. Since incorporation the Debtor has

sold over 10,000 acres of such tracts at a sales price in excess of 3.6 million dollars. The Debtor presently owns and is attempting to market subdivided tracts of about 895 acres, which it values at market at $544,000.00. The usual contract for sale was 10% down, with the balance payable over 10 years at 10% interest. In addition to the unsold tracts, the Debtor has reacquired about 314 acres of tracts due to defaults in land sales contracts. The Debtor estimates the resale value of these tracts is $111,000.00

From 1972 to 1977, Debtor generated net income which ranged from a high of $244,-952.00 in 1974 to a low $68,075.00 in 1977. Beginning in 1978, the Debtor has sustained a loss in each year except 1983 so that through 1985, the total loss from operations for all years was $595,208.00. The history of operations shows that the primary reason for the change in the Debtor's financial situation beginning in 1977 was the drastic reduction in acres sold during the last eight years. For example, the average sales per year for the first five years was 1,438 acres per year, while the average sales in the last eight years was 397 acres per year. Three principal reasons are assigned by the Debtor for the dramatic decrease in sales, namely, (1) litigation involving allegation of fraud by a contract seller of 125 acres, which was finally resolved in Debtor's favor, (2) breach of a service contract to supply electric power hookups by an REA Co-op, which is yet unresolved in state court litigation, and (3) the advent of two forest fires in 1983 and 1984 in Musselshell County which caused buyer apprehension and in fact destroyed homes constructed on the Debtor's subdivision. The Debtor believes the fire dilemma or fear is now subsiding so that sales can be made of the tracts over the next ten years, at a projected profit of $347,000.00, not including interest earned from contract sales.

Under the proposed plan, all secured creditors will retain their liens on collateral, and be paid in full in ten years. Unsecured creditors will receive periodic payments in six month intervals beginning 60 days after confirmation until paid in full. The objecting creditor, Valley Bank, has a claim of $146,831.81 secured by a mortgage on some of the Debtor's real property, known as the Phillips Subdivision (353 acres) and assignment of 11 land sales contracts. Debtor proposes to pay the Valley Bank debt in interest only at 11% for the first two years at $1,345.96 per month, and then make equal semi-annual payments of principal and interest for the next 8 years at a market rate of interest of 11%. As the mortgaged tracts are sold, the Debtor would request partial satisfaction of mortgages in return for payment of 90% of cash generated upon sale, and then assign the contract as additional collateral. The collateral of Valley Bank has a present value of $90,465.75 in contracts and a market value of the real property of $187,200.00, for a total value of $277,665.00. I find, therefore, the Valley Bank is oversecured, and is thus entitled to interest on its debt post-petition in accordance with Section 506(b) of the Code.

At the outset I quote from *In Re Martin*, 66 B.R. 921, 928 (Bankr.Mont.1986):

"Certain principles dealing with confirmation of a Chapter 11 Plan are well established. Regardless of whether a valid objection to confirmation has been asserted, the Code imposes upon the Court the responsibility and duty to determine whether the requirements of Section 1129(a) have been met. (Citing cases)."

On each issue, the Debtor has the burden of proof. *Id.*

■ From the evidence developed at the hearing, the Bank established that the present value of the deferred cash payments proposed under the Plan as of November 1, 1986, was $134,674.20. Yet, the present value of the Bank's debt is $146,-831.81. The Bank's calculations were based on a 12% annual interest rate, while the Debtor proposes as a market rate 11% per annum. The flaw in the Bank's analysis has to do with its assumption that 12%

is a proper interest rate. *Martin,* supra, at 930 holds:

" * * * the plan must, to be confirmed over the dissent of the secured creditors, propose that the secured creditors retain a lien in the collateral securing the amount of their allowed secured claims, and that they receive deferred cash payments having a present value equal to the value of the collateral securing their claims as of the effective date of the plan. 11 U.S.C. Section 1129(b)(2)(A)(i). If the plan also proposes to pay the secured creditors a reasonable rate of interest on their allowed secured claims, the present value and face value will be identical. See H.R.Rep. No. 595, at 414–15, 1978 U.S.Code Cong. & Ad.News at 6370–71."

Thus, if the fair market rate of interest is 11% for the term of the Plan, the Bank will be paid deferred cash payments equal to the present value of its debt of $146,831.81. The Bank's evidence is that it assumes 12% should be the market rate of interest, not the projected interest under the Plan at 11%. Based on that assumption, the payments based upon lower interest rates certainly would not have a present value equal to the amount of the debt. The cases of *In Re Welco Industries Inc.,* 60 B.R. 880 (BAP 9th Cir.1986) and *United States v. Neal Pharmacal Co.,* 789 F.2d 1283 (8th Cir.1986), have settled the issue as to the appropriate rate of interest by holding the appropriate discount or interest rate is to be fixed by considering the "prevailing market rate for a loan of a term equal to the payment period, with due consideration of the quality of the security and risk of subsequent default". Applying that test to this case, where the Bank is sufficiently oversecured, and its officer testified that 11% interest is presently being charged for installment rates over six months, I conclude the prevailing rate of interest for a similar loan would be a maximum of 11%, which is the amount proposed in the Plan. Thus, Section 1129(b)(2)(A)(i) is satisfied.

The next major objection made by the Bank is that the Plan is not feasible. Again, quoting from *In Re Martin,* supra, at 925, it was held:

"The Plan must be feasible, that is, confirmation of the Plan under Section 1129(a)(11) is not likely to be followed by liquidation or the need for further reorganization of the Debtors. *In Re Prudential Energy,* supra, [58 B.R. 857] holds at 862–63:

'Guaranteed success in the stiff winds of commerce without the protection of the Code is not the standard under 1129(a)(11). Most Debtors emerge from reorganization with a significant handicap. But a plan based on impractical or visionary expectations cannot be confirmed. (Citing cases and authority). All that is required is that there be a reasonable assurance of commercial viability. *In Re Trail's End Lodge,* 54 B.R. [898] at 904 [Bankr.Vt.1985].'

Further, *In Re Clarkston,* 767 F.2d 417, 420 (8th Cir.1985), states:

' * * * The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts. *In Re Bergman,* 585 F.2d 1171, 1179 (2nd Cir.1978) (quoting 9 *Collier on Bankruptcy* at 1139). Pertinent factors to be considered include the business's earning power, the sufficiency of the capital structure, economic conditions, managerial efficiency, and whether the same management will continue to operate the company. *In Re Great Northern Protective Services, Inc.,* 19 B.R. 802, 803 (Bankr.W. D.Wash.1982.' "

In the present case the Debtor projects total sales of $650,070.00 or $80,400.00 annually, to augment its present contract receivables. The schedules presented by the Debtor in its Disclosure Statement are summarized as follows:

| Year | Total Income | Total Expense | Net or Loss |
|------|-------------|---------------|-------------|
| 1 | $ 48,507.42 | $73,145.73 | $ (24,638.31) |
| 2 | 87,299.80 | 69,235.52 | 18,064.28 |
| 3 | 96,309.64 | 78,106.96 | 18,202.68 |
| 4 | 105,449.10 | 6,354.40 | 41,927.70 |
| 5 | 117,382.17 | 54,450.96 | 62,931.21 |
| 6 | 98,401.08 | 60,373.77 | 38,027.31 |
| 7 | 107,689.98 | 59,873.77 | 47,816.21 |
| 8 | 120,460.30 | 59,473.77 | 60,986.53 |
| 9 | 108,348.07 | 59,373.77 | 48,974.30 |
| 10 | 94,577.46 | 59,391.40 | 35,186.06 |

Included in each year of expense are payments to the secured creditors. First Citizens Bank will be paid in full by the end of the fourth year of the Plan, Murphy will be extended to the life of the Plan as will Valley Bank, while Cripps and Bailey will be paid out by the end of the second year. No provision for payment of debts due stockholders or insiders has been made in the Plan while secured or unsecured creditors are owed a balance on their claim.

■ The Bank presented two witnesses who testified the Plan is not feasible. A Certified Public Accountant called by the Bank stated the projected sales as tested against historic data is unreasonable. The Plan calls for sale of 145 acres or nine tracts per year, while the historic data shows sales in acres from 1981 to 1985 ranging from a low of 20 acres to a high 404 acres. As to the high years of sales, however, the records indicate sales made to insiders or with substantial discounts. Further, the accountant gave the opinion that the projected expenses were very conservative and therefore unrealistic. In this area the Bank's witness states the Debtor's data made no provisions for bad debts, i.e., delinquent contract payments, even though the historic data shows a wide range of delinquencies. The witness gave the opinion that a delinquent rate of 10% should have been factored into the expense ledger. Income taxes were also ignored, even though the Debtor projects net income in nine out of ten years. I deem these objections to be without merit in view of the projected cash flow of the Plan, which shows significant net profits over the next

ten years sufficient to cover all expenses of operation, including taxes and bad debts.

■ The second witness of the Bank, a real estate broker and developer, although not having specific knowledge of the Debtor's operation, gave the opinion that the projected sales of recreational tracts by the Debtor will not occur because in the last three years sales have declined precipitiously in the market generally to a point where there is no market for such tracts at the present time. The Plan calls for nine tracts a year to be sold, but based on the multiple listing only three tracts in 1985 were sold in the entire area. Although multiple listing is not an indication of all sales, based on that data, the witness stated it would be more realistic to project sales of two to four per year for the next three to five years. He questioned the adequacy of the sales staff of the Debtor, for even to achieve two to four sales per year, one would need two full times sales persons, with an expense of $12,000.00 to $18,000.00 annually for advertising. Contrasted with that opinion is the Debtor's Plan calling for $500.00 per year in advertising budget. Notably, the Debtor's historic figures show advertising outlays in 1983 at $24,000.00 and 1984 at $18,000.00.

In answer to the Bank's testimony, the Debtor's President stated the Timber Tracts' lands are more desirable, having good all weather road access near town, and that sales would be on the upswing because the fire fear has diminished. Even assuming there is a shortfall in sales, or lack of accurate expense projections, the Debtor has available to it capital cash infusion from the law firm of the Debtor's

president, Floyd Brower, in an amount of $2,000.00 per month.[1]

The history of the company shows land sales of significant amounts in subdivided tracts with good to excellent amenities. The project has thus been established and it is not one which is a mere visionary scheme, without any track record. We have, therefore, an established company, with land holdings in place and tracts presently available for sale. The criticisms by the Bank may indeed have merit, but in looking at the elements of feasibility set forth in *In Re Martin*, supra, I find the earning power, sufficiency of capital structure, management efficiency and continuity of management are present under the Plan. The only real skepticism in the Plan is the economic condition facing the Debtor and whether a sustainable market for recreational tracts can be achieved is open to question. If the Debtor had not proposed in its Plan a back-up position for capital infusion, as it has done, I would find it difficult on the basis of the present record to conclude that the projected sales will materialize. Given, however, the factors that land sale activities are in a position to proceed immediately, and additional capital to fund the Plan is available to the Debtor if the sales projections prove unrealistic, I find the Plan has a reasonable assurance of commercial viability. It is to be remembered that if the payments to the Valley Bank, or any other creditor, are not made as proposed in the Plan, the Bank, as a secured creditor, may immediately seek legal recourse in state court to foreclose on its collateral. See *In Re Herron*, 60 B.R. 82, 84 (Bankr.W.D.La.1986); *In Re R.C.E. Corp. (In Re Ernst)*, 45 B.R. 700, 12 CBC2d 305 (Bankr.Minne.1985).

■ The Bank further contends the Plan is unfair because its loan is restructed over a ten year period, while other secured creditors are paid within a shorter period of time. Accompanying this argument is that the Plan is not fair and equitable because

the Bank cannot proceed against co-signers on the notes, and the Debtor could sell the land at ridiculously low prices, which would jeopardize the lienholder's collateral. Again, returning to *In Re Martin*, supra, at 930, this court held:

"Finally, Hancock complained that its note and mortgage is unfairly restructured from 7 years to 20 years. The answer to such argument lies in the Code itself which allows such result.

'As one commentator has noted, bankruptcy courts may "cram down" feasible plans of reorganization under the reorganization provisions (e.g. Section 1129) of the new Bankruptcy Code, where such plan seeks to achieve restructuring of mortgage debts secured by real estate as follows:

(1) The term of any mortgage debt may be extended;

(2) Payment required by the mortgage debt of either principal or interest may be postponed; and

(3) Deferred or reduced payments of principal or interest may be added to the mortgage balance.' *In Re Hollanger Rice Farm, Inc.*, 15 B.R. 35, 47 (Bankr.W.D.La.1981."

I do not find this restructuring of the Valley Bank note to a ten year term at 11% interest unreasonable. The President of the Debtor explained the Plan's treatment of the Valley Bank obligation as follows:

, "* * * The Valley Bank on their larger note never did have a schedule of payments. The way it was done was each 90 days the interest was to be paid and a reduction in principal, if possible. There never was a schedule of payments for Timber Tracts. There was a schedule of payments for the First Citizens Bank and other creditors. * * * In addition to that, there was a revolving credit line which also did not have a schedule of payments. The large amount of the loan indicated to me made it necessary to make a 10 year plan out of this."

---

1. The Bank correctly notes this condition is not specifically provided for in the Plan. I deem the Plan amended by the testimony of the Debtor, and upon confirmation a formal modification in writing should be filed by the Debtor.

The payment schedule is one of necessity to fit the income stream projected by the Debtor, not one in which Valley Bank is unfairly treated. Moreover, I do not find any merit in the speculative argument that the Debtor would sell the recreational tracts at sacrifice prices, evidently to injure the Bank. Suffice to say, that during the course of this proceeding the Debtor agreed to and has consistently been paying adequate protection payments on a monthly basis to Valley Bank, which indicates its good faith, and there is absolutely no evidence in this record to support a finding that the Debtor intends to sell low and run from this project. Indeed, the evidence is to the contrary, showing sufficient sales activity at market prices, which refutes the Bank's speculation.

The co-signers on the note, being all of the Debtor's officers and stockholders, still remain liable under the Plan in the event of default. No testimony was introduced by the Bank on this issue, although the Bank argued such matter in its Brief. The argument is without any legal basis because "due process prohibits confirmation of a Plan which deprives the creditors of their rights to pursue any action they may have against nondebtors". *Matter of Mandalay Shores Co-op Housing Assn.*, 53 B.R. 609, 615, (Bankr.N.D.Fla.1985); *In Re A.J. Mackay Co.*, 50 B.R. 756, 761 (D.C.Utah 1985).

I conclude after notice and hearing:

1. That the Plan complies with the applicable provisions of Chapter 11 of the Code;

2. That the proponents of the Plan comply with the applicable provisions of the Code;

3. That the Plan has been proposed in good faith and not by any means forbidden by law;

4. (A) That any payments made or promised by the Debtor for services or costs and expenses in connection with the case, or in connection with the Plan and incident to the case, have been disclosed to the court;

(B) Any such payment made before confirmation is reasonable;

5. (A) Debtor has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtor, and appointment to or continuance in such office of such individual, is consistent with the interest of creditors and equity security holders and with public policy;

(B) That Debtor's Plan discloses the identity of any insider that will be employed or retained by the reorganized Debtor and the nature of cooperation of such insider;

6. With respect to each class:

(A) Each holder of a claim or interest of such class has accepted the Plan or will receive or retain under the Plan an account of such claim or interest property of a value, as of the effective date of the Plan, that is not less than the amount that such holder would so receive or retain if the Debtor was liquidated under Chapter 7; or

(B) Under Section 1129(b)(2) of the Code, each holder of a claim of such class will receive or retain under the Plan an account of such claim property of a value as of the effective date of the Plan, that is not less than the value of such creditor's interest in the estate's interest in the property that secures such claims;

7. With respect to each class, such class has accepted the Plan and the Plan provides that:

(A) With respect to a claim of a kind specified in Sections 507(a)(1) or 507(a)(2) of the Code, on the effective date of the Plan, the holder of the claim will receive on account of such claim cash equal to the allowed amount of such claim.

(B) With respect to a class of claims of a kind specified in sections 507(a)(3), 507(a)(4), or 507(a)(5) of the Code, each holder of a claim of such class will receive,

if such class has accepted the Plan, deferred cash payments of value, as of the effective date of the Plan, equal to the allowed amount of such claim; or, if such class has not accepted the Plan, cash on the effective date of the Plan equal to the allowed amount of such claim; or

(C) With respect to a claim of the kind in Section 507(a)(6) of the Code, the holder of such claim will receive on account of such claim deferred cash payments, over a period not exceeding 6 years after the date of assessment of such claim, of a value, as of the effective date of the Plan, equal to the allowed amount of such claim; or

(D) With respect to each class of secured creditors who are impaired under the Plan and have not accepted the Plan, the Plan does not discriminate unfairly and is fair and equitable with respect to each class and the Plan complies with Section 1129(b)(2)(A) of the Code;

8. At least one class of claims has accepted the Plan, determined without including any acceptance of the Plan by an insider holding a claim of such class;

9. No regulatory commission with jurisdiction is involved in the Plan.

10. Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtor or any successor debtor under the Plan, unless such liquidation is proposed in the Plan.

IT IS ORDERED Debtor's Chapter 11 Plan of Reorganization is confirmed.