**In re VZ RANCH, INC., Debtor.**

**Bankruptcy No. 86–40009.**

United States Bankruptcy Court, D. Montana.

Jan. 29, 1987.

James A. Patten, Patten Law Firm, P.C., Billings, Mont., for debtor.

### ORDER

JOHN L. PETERSON, Bankruptcy Judge.

In this Chapter 11 case, hearing was held on November 20, 1986, on confirmation of the Debtor's Seconded Amended Plan of Reorganization. Ballots from creditors filed with the Clerk are as follows:

| Class | Creditor | Amount | Vote |
|-------|----------|--------|------|
| 1 – Secured | Federal Land Bank (FLB) | $1,219,866.41 | Reject |
| 3 – Secured | Jack and Wanda Swope | 1,002,248.56 | Reject |
| 4 – Secured | First Security Bank and Trust of Miles City | 895,536.00 | Reject |
| 5 – Secured | Small Business Administration (SBA) | 143,500.00 | Reject |
| 6 – Unsecured | Bob Gray | Unstated | Approve |
| | Beacon Carter Service | 1,414.75 | Approve |
| | Horizon Equipment | 63.56 | Approve |

All classes of creditors are impaired in that their legal rights are modified by the Plan. *In Re Acequia,* 787 F.2d 1352, 1363–64 (9th Cir.1986). Section 1129(a)(10) provides that at least one class of impaired creditors, excluding any insider, must affirmatively vote in favor of the Plan as one of the eleven conditions required for confirmation. That subsection is satisfied in this case by the unsecured class of creditors voting in favor of confirmation.

Objections to the Plan were filed by FLB, Swope, First Security Bank and SBA. These creditors contend the Plan is not filed in good faith, it is not feasible, nor is the Plan fair and equitable under the cramdown provisions of Section 1129(b) of the Bankruptcy Code. FLB, Swope, First Security Bank and SBA have also filed motions for relief from the automatic stay or motions to dismiss this proceeding on grounds there is no reasonable likelihood of reorganization and there is a continuing loss to or diminution of the estate.

The Debtor is engaged principally in a farm operation on property it is purchasing from Swopes in Custer County, Montana, and is also the contract seller or owner of eight other parcels of ranch properties in Montana. The nine parcels in which the Debtor has an interest are as follows:

*Parcel One.* Debtor is seller under a Contract For Deed with Avalos/Crawford. The contract is in default and Debtor estimates its equity at $50,000.00, based on a fair market value of $300,000.00. There is $250,000.00 owed against the parcel to Avalos.

*Parcel Two.* Debtor is purchasing this parcel from John and Wanda Swope, and is in default of the contract, which presently has a balance due of $1,041,000.00. The Debtor values the real property at $1,420,000. SBA holds a second mortgage on the property in the amount of $143,000.00, and the First Security Bank has a third mortgage, together with other collateral. Swopes, at a prior hearing, introduced evidence that the fair market value of the property was $1,380,000.00. Swopes rely upon the payment from the Debtor to make mortgage payments on property they are presently purchasing. I find the fair market value of the property is $1,420,000.00, thus leaving an equity after the first two mortgages of $233,000.00. The subject of the value of the First Security Bank mortgage on the property will be discussed later.

*Parcel Three.* Debtor is contract seller of the parcel, which has a fair market value of $275,000.00, and a balance due under the contract of $137,838.61. Debtor, however, owes $206,653.00 on the property to an insider, Laura Roberts. There is no equity value in the property, but Debtor's Disclosure Statement reflects the annual contract payment is $24,700.00.

*Parcel Four.* Debtor is contract seller, and Clark is the buyer of the property.

The contract balance is $612,852.00, and the property is subject to an underlying mortgage due FLB of $400,000.00. Debtor thus places a fair market value on the property at $955,000.00, but discounts the contract by 50%, thus placing a fair market value on the contract at $106,000.00. The Debtor receives $34,000.00 per year from the contract.

*Parcel Five.* Debtor is selling this parcel to Deitchler, with a balance due of $160,000.00. Debtor values the property at $600,000.00, and has discounted the fair market value of the contract by 25% due to the age of the contract, thus leaving an equity of $120,000.00. The annual payment under this contract is $16,700.00.

*Parcel Six.* Debtor is contract seller of this parcel, with Mathias as the buyer. The contract is in default, and has a balance due of $538,000.00. The Debtor valued the property at $600,000.00, while FLB's appraiser set the fair market value at $500,000.00. The FLB holds a first mortgage position on the property in the amount of $841,311.00. Under either appraisal, the land has depreciated in value so that there is no equity in the property on which the Debtor may relay to fund a Plan of Reorganization. Indeed, the Debtor's president testified the property is not needed to make the Debtor's Plan effective, and thus the motion for relief from stay on this parcel must be granted to allow FLB to foreclose its interest under the mortgage.

*Parcel Seven.* The Debtor is selling this parcel to Pauley, under a September, 1980, Contract For Deed, which has a present balance due of $94,810.00. Debtor values the property at $125,000.00, and has discounted the contract balance by 25%, claiming a fair market value of the contract is $66,238.00. There is no underlying mortgage against this property, the contract payments are current, and produce $9,700.00 per year, with a balloon payment due of $89,340.00 in 1990.

*Parcel Eight.* Debtor has combined three separate parcel of land in this parcel. One of the properties is located in Stillwater County, and is being sold to Dinkel under a Contract For Deed whereby the buyer assumed payment of a mortgage due FLB, which has a present amount due of $502,933.00, now in default. Debtor valued the property at $750,000.00, while FLB's appraiser placed a fair market value on the property at $454,000.00. Debtor's plan is to sell the property by November, 1987, and turn over the proceeds to FLB. If the Debtor is unable to sell the property by that date, Debtor would surrender the property to FLB by deed. The Debtor claims that it sold the property on August 1, 1986, for $750,000.00, but the testimony at the confirmation hearing developed the sale has fallen through. The FLB appraisal is based on a comparable sale analysis, and one of the comparable sales used by the appraiser was of property located adjacent to the subject property. After making adjustments for size, time of sale and quality of the comparable land, the appraiser tested the market data appraisal with an income analysis at a capitalization rate of 5%. The testimony was not impeached by the Debtor, nor rebutted in any significant manner. I find the appraisal testimony of FLB more credible and therefore find the fair market value of the Stillwater County tract to be $454,000.00, thus leaving no equity in the property for reorganization of the Debtor's business. Again, under these circumstances, the motion for relief from stay of FLB must be granted.

The other properties in Parcel Eight are lands located in Ravalli and Missoula County, which the Debtor values at $179,500.00. The Debtor is actively seeking buyers for both properties, and neither property is encumbered, thus leaving the Debtor with a potential equity of $179,500.00.

*Parcel Nine.* This parcel is owned by the Debtor and is subject to a mortgage due FLB in the sum of $125,000.00. The value of the property fixed by the Debtor and unchallenged by any party is $158,500.00, leaving an equity of about $33,500.00, before costs of sale.

In summary, from the above findings the Debtor has contract rights and equity interests which total $555,238.00, exclusive of

the Swope property. The Debtor owns farm machinery and equipment, all pledged as collateral to the First Security Bank, which is valued at $152,100.00. The Debtor has harvested 62,900 bushels of winter wheat, and such crop will sell for about $128,945.00. Again, these sale proceeds are subject to the mortgage of First Security Bank.

The Debtor's Second Amended Plan of Reorganization is to sell Parcels One, Five, Six, Seven, Eight and Nine, and hold Parcels Two, Three and Four to fund payments under the Plan. Under the proposed Plan, FLB will be paid its indebtedness from sale of Parcels Six, Eight and Nine by November 1, 1987, and the remaining debt of FLB on Parcel Four will be paid from the proceeds of sale due under the Contract For Deed. Swope and SBA will be paid from the income generated from the operation of Parcel Two, but each mortgage payment will be deferred until 1987.

First Security Bank is to be paid from the equities generated from the sale of Parcels One, Five, Six, Seven, Eight and Nine, and the remaining balance due after credit of the sales proceeds shall be paid at the rate of $77,000.00 in 1987, $67,000.00 in 1988 and $57,000.00 thereafter until paid in full after 20 years with interest under the contract rate as provided in the notes. The Debtor acknowledges that for the Plan to succeed it must obtain $640,000.00 from the sale of Parcels One, Six, Eight and Nine to pay to the Bank so that the remaining balance of $260,000.00 can be handled from the cash flow of the contract payments and operation of the Swope ranch. As is clear from the above findings, there will be no net sales proceeds from Parcels Six and Eight, and Parcels One and Nine will net the Debtor only $83,500.00, thereby leaving the Debtor over $550,000.00 short of funding the Plan as far as First Security Bank is concerned. Thus, the Debtor will also have to sell its contract interests in Parcels Five and Seven. The Bank has a security interest in each Contract For Deed on Parcels One, Four, Five, Seven and Eight. If the Debtor's interest in Parcels Five and Seven are likewise sold, an additional $186,-

238.00 may be paid over to the Bank, but even if this event occurs, the balance due the Bank will still exceed over $630,000.00. I am unable to discern from the Plan or from the evidence presented at the confirmation hearing, how such balance can be amortized over 20 years at 11% interest, for it would take $69,300.00 for interest on the first payment, and reduce the principal by only $7,700.00. The amortization of such amount cannot be made under the Plan as proposed.

From the above findings, the Debtor has overvalued its total equity position which it can use to satisfy the claim of secured creditors by at least $250,000.00. The Debtor uses the equity in the Swope place of $233,000.00 as a basis for payment of such creditors, yet the Plan does not envision sale or refinance of that equity, but rather proposes retention of the property for producing annual income of $180,000.00 per year. In addition, the cash flow analysis of the Debtor includes annual contract receipts from Parcels Three, Four, Five and Seven, but fails to reflect that at least Parcels Five and Seven will have to be sold to reduce the debt of FLB and First Security Bank.

The history of the Debtor's farm operation from its tax returns shows a negative cash flow four out of the last five years, with losses in one year (1984) of $340,-000.00. Moreover, two real estate contracts relied upon by the Debtor for its cash flow are in default. From the operation of the Swope ranch, the Debtor projects gross income per year of $180,-000.00, from wheat production on 4500 acres of land, yielding 18 bushels per acre, at a price of $2.25 per bushel. The annual projected expense is $94,200, leaving the Debtor with $85,800.00 per year to assist in payment of the secured creditors under the Plan. The record is clear that the Swope contract itself calls for annual payments of $105,451.50, and the Plan proposes to pay the First Security Bank at least $77,000.00 in the first year. The Debtor anticipates leasehold rental payments of at least $9,000.00 per year, but probably $24,000.00

is more realistic, which still leaves the cash flow insufficient to fund the Plan, assuming FLB is fully taken care of from the sale of the properties on which it holds a first mortgage. The cash flow analysis advanced by the Debtor includes payment to SBA of at least $14,000.00 per year and Laura Roberts of $10,000.00, thereby placing an additional debt burden against the income stream. The income statement assumes good weather conditions and continued government wheat subsidy payments, but the Debtor admits it has made no provision for crop insurance against casualty loss. I find from the evidence that the Debtor will generate income of $204,000.00 per year from operation of the Swope ranch and leases of pasture, that its operating costs will be at least $94,200.00 per year and that the balance of funds available to creditors will then be $109,800.00. Even if I would accept the Debtor's conflicting position that an additional $58,-700.00 per year would be available from Parcels Three and Four under the Contracts For Deed, the total net sum available for payments to creditors is $168,500.00, so the Plan as proposed is short of reaching the necessary payments of $186,000.00 to Swope, SBA, First Security Bank and Roberts, to say nothing of payments to unsecured creditors or FLB. To recap the Debtor's evidence, Disclosure Statement and Plan, the cash flow and debt payments are:

### A. Annual Net Income:

| | |
|---|---|
| Swope Ranch | $ 85,800.00 |
| Leases on Pasture | 24,000.00 |
| Parcel 3 Contract | 24,700.00 |
| Parcel 4 Contract | 34,000.00 |
| Total | $168,500.00 |

### B. Annual Net Payments:

| | | |
|---|---|---|
| Swope | $105,451.50 | |
| | | (Reduced to |
| First Security Bank | 77,000.00 | $57,000.00) |
| SBA | 14,000.00 | |
| Roberts | 10,000.00 | |
| Total | $206,451.50 | to $186,451.00 |

Deficiency—$37,951.00 to $17,951.00

As held in *In Re Martin*, 66 B.R. 921, 925 (Bankr.Mont.1986):

"The Plan must be feasible, that is, confirmation of the Plan under Section 1129(a)(11) is not likely to be followed by liquidation or the need for further reorganization of the Debtors. *In Re Prudential Energy*, supra, [58 B.R. 857] holds at 862–63:

'Guaranteed success in the stiff winds of commerce without the protection of the Code is not the standard under 1129(a)(11). Most Debtors emerge from reorganization with a significant handicap. But a plan based on impractical or visionary expectations cannot be confirmed. (Citing cases and authority). All that is required is that there be a reasonable assurance of commercial viability. *In Re Trail's End Lodge*, 54 B.R. [898] at 904.'

Further, *In Re Clarkston*, 767 F.2d 417, 420 (8th Cir.1985), states:

' * * * The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts. *In Re Bergman*, 585 F.2d 1171, 1179 (2nd Cir.1978) (quoting 9 *Collier on Bankruptcy* at 1139). Pertinent factors to be considered include the business's earning power, the sufficiency of the capital structure, economic conditions, managerial efficiency, and whether the same management will continue to operate the company. *In Re Great Northern Protective Services, Inc.*, 19 B.R. 802, 803 (Bankr.W. D.Wash.1982).'

In *In Re Acequia, Inc.*, supra at 1364, the Court alluded to Section 1129(a)(11) in this manner:

'Finally, we find that the Plan satisfies the "feasibility" requirement of 11 U.S.C. Section 1129(a)(11) (1982). The debtor presented ample evidence to demonstrate that the plan has a reasonable probability of success. *See generally In Re Merrimack Valley Oil Co.*, 32 B.R. 485, 488 (Bankr.Mass. 1983). The debtor provides both 'conservative' and 'best case' projections. The debtor's experts testified that the debtor's assets are attractive and in demand. That the plan provides for eventual liquidation of assets does not preclude confirmation. 11 U.S.C. Sec-

tion 1123(a)(5)(D) (1982); *In Re Costal Equities, Inc.*, 33 B.R. 898, 904 (Bankr. S.D.Cal.1983). We do not agree with Clinton's assertion that the plan is a "visionary scheme", *In Re Pizza of Hawaii*, 761 F.2d [1374] at 1382 (9th Cir.1985). (Quoting 5 *Collier* 15th, supra, P. 1129.02 at 1129–34) and we find no abuse of discretion in the bankruptcy court's determination that the plan is feasible.' "

Under the best treatment of the Plan taken from the Debtor's own figures, the Plan is visionary, and as a practical matter, the payments proposed to the creditors cannot be made. As a result, the Plan does not satisfy the requirements of 1129(a)(11), so I conclude from the facts that the Plan has no reasonable probability of success. Confirmation may not be allowed without full satisfaction of each of the requirements of 1129(a) (except for 1129(a)(7) in a cramdown case), or on each element the Debtor has the burden of proof. *In Re Prudential Energy*, supra, at 862. Because of this holding, it is not necessary to decide whether the Plan would satisfy the absolute priority rule under Section 1129(b), or whether the Plan has been filed in good faith. I further fail to see why this case should be prolonged to allow another amendment to the Plan when the best estimates of the Debtor convince the Court the Debtor has not been able to fashion a confirmable Plan of Reorganization after many months in Chapter 11. If the Debtor can do so, it would have an opportunity to restructure a proposed Plan in a motion for reconsideration of this Order.

IT IS ORDERED the Debtor's Second Amended Plan of Reorganization is denied confirmation.

IT IS ORDERED the motion for relief of the automatic stay filed by FLB to Parcels Six and Eight is granted.

IT IS ORDERED the motion for relief from stay filed by John and Wanda Swope and SBA to Parcel Two is granted.

IT IS ORDERED the Motions to Dismiss this proceeding filed by SBA and FLB are granted and this proceeding is dismissed.