**In re ROBERTS ROCKY MOUNTAIN EQUIPMENT COMPANY, INC., Debtor.**

**Bankruptcy No. 285–00419.**

United States Bankruptcy Court, D. Montana.

April 16, 1987.

Daniel R. Sweeney, Butte, Mont., W. Arthur Graham, Missoula, Mont., for debtor.

## ORDER CONFIRMING PLAN OF REORGANIZATION

JOHN L. PETERSON, Bankruptcy Judge.

In this Chapter 11 proceeding hearing on the Debtor's Plan of Reorganization was held April 2, 1987. Ballots of creditors filed with the Clerk are as follows:

| Class | Status | Creditor | Amount | Vote |
|-------|--------|----------|--------|------|
| A | Secured | U.S. Small Business Administration (SBA) | $450,025.34 [1] | Rejects |
| B-1 | Secured Priority | Internal Revenue Service (IRS) | 221,299.52 [2] | Rejects |
| G | Unsecured | Howard-Cooper | 980.00 | Accepts |
| | | Columbia Paint | 74.84 | Accepts |
| | | RDM Enterprises | 1,800.00 | Accepts |
| | | Northwest Motor Welding | 1,356.79 | Accepts |
| | | Butte Water Co. | 176.83 | Accepts |
| | | Quality Business Forms | 1,702.07 | Accepts |
| | | Pioneer Equip. & Supply | 2,988.56 | Accepts |
| | | Ford Motor Co. | 5,407.24 | Accepts |
| | | Montana Teamsters Employers Trust | 4,922.85 | Accepts |
| | | Nat'l I.A.M. Benefit Trust (I.A.M.) | 7,114.72 | Accepts |
| | | Montana Power Co. | 1,122.53 | Rejects |
| | | Yellowstone Hydraulics | 169.82 | Rejects |
| | | Puget Sound H-W Trust | 1,860.40 | Rejects |

The Class of unsecured creditors shows nine creditors, totaling $26,528.90 accept the Plan and three creditors totaling $3,152.75 reject the Plan. A class affirmatively accepts a Plan if a majority of those voting representing at least two thirds in dollar amount vote in favor of the Plan. As a threshold matter in any Chapter 11 confirmation case, under Section 1129(a)(10) at least one class of claims must affirmatively vote to accept the Plan of Reorganization. *In re VZ Ranch,* 69 B.R. 577, 578, 4 M.B.R. 69, (Bankr.Mont.1987); *In re Pine Lake Village Apt. Co.,* 19 B.R. 819, 829 (Bankr.S.D.N.Y.1982). In this case, the class of unsecured creditors has voted in favor of the Plan and thus 1129(a)(10) is satisfied. All classes of creditors are impaired under the Plan in that their legal rights are modified by the Plan.

*In re VZ Ranch,* supra; *In re Acequia,* 787 F.2d 1352, 1363–64 (9th Cir.1986). Objections to the Plan were filed by SBA, IRS and I.A.M. Benefit Trust. At the hearing, I.A.M. Benefit Trust withdrew its objections in favor of the Plan, upon Debtor's modification to the Plan to provide payment to the Trust of $7,914.00 as an administrative expense to be paid within 60 days of confirmation. The objections of SBA and IRS will be discussed later in this opinion on each issue raised by these government agencies.

At the outset, this Court would comment that the Debtor's Chapter 11 proceeding is the anatomy of a distressed small business in Montana. Roberts Rocky Mountain Equipment Company, Inc., the Debtor, was incorporated in April, 1960, after conduct-

1. The Debtor and SBA stipulated at the confirmation hearing that the true amount due SBA after credit for adequate protection payments was $450,025.34. The ballot of SBA was filed in the amount of $509,038.33.

2. The ballot filed by IRS lists its claim as secured in the amount of $140,532.11 and unsecured in the sum of $88,401.41. The evidence shows, and the Debtor's Plan concedes, that the entire claim is $221,291.29, is treated as partially secured and as a priority tax claimant to be paid in full.

ing business as a proprietorship for several years prior to incorporation. The business has been ongoing in Butte for approximately 40 years and has always been in the business of heavy equipment sales and service. The current business facility is located at 1901 Franklin in Butte, Montana, on approximately 3.55 acres of land and improvements and is leased from the major stockholder of the Debtor, Joseph H. Roberts. Much of the facility is yard for the housing and display of equipment, inventory and used parts, yet also includes two buildings for parts, sales and storage, and service. The business premises are located just off an Interstate 90 highway exit into Butte near the downtown area.

 Two appraisals of the business premises have been offered in evidence, one by the Debtor and the other by SBA. The Debtor's appraisal based on a cost appraisal fixes the fair market value of the land, buildings and improvements at $732,-800.00, as a going-concern value. In Chapter 11 cases, where prospects of the business succeeding are good, the Court must use a going-concern as opposed to a liquidation value. *In re Martin,* 66 B.R. 921, 927 (Bankr.Mont.1986). The appraiser for SBA fixed the value based on a cost and income approach at $400,000.00. If liquidated at forced sale, SBA estimated the value at $260,000.00. I adopt the valuation fixed by SBA at $400,000.00 as a fair market value, since even with that appraisal such creditor is oversecured.

The Debtor is presently in the business of sales and service of heavy equipment and parts. Because of drastic reduction in demand in the Butte and Western Montana areas, the Debtor in the recent past has had to drastically reduce emphasis on sale of new heavy equipment. Sales have continued in the areas of new and used parts and used equipment, and the Debtor will continue to sell new equipment on an order-by-customer basis. The emphasis on inventory of new equipment is not contemplated for the near future. Major customers are based on the trucking, mining, construction and agricultural industries of the State and Northwest region, all of which, for various economic reasons, have been under going difficult financial times. As a result, due to lack of consumer demand and difficulty in obtaining financing by its consumers, the Debtor's sales business has moved during the last few years from a concentration of sales of new equipment to concentration in sales of used and consigned equipment.

The Debtor is a closely held corporation by members of the Roberts family. The major shareholder is Joseph H. Roberts, who owns in excess of 75% of the outstanding stock. Current and day to day management of the business is in the hands of Joe Roberts, President of the Company. Joe is the founder of the business and has managed the business for approximately forty years. He is a well known businessman nationally, and has gained respect from business persons with whom he has dealt. Joe brings to the business a great amount of experience both in management and in sales and service and he will continue with management of the company so as to provide a continuity of management and preserve the jobs of at least 15 employees of the company. SBA and IRS, through their objections to the Plan, have displayed no concern for the continued employment of the personnel of the Debtor.

In contrast, in order to successfully reorganize the company, the Debtor's post-petition activities relative to employees included the layoff of seven employees so as to reestablish cash flow of the business by reducing operating expenses. Under the Plan of Reorganization, no additional employees will be laid off unless the established stable financial condition of the company precipitously declines.

A number of forces led to the financial problems of Roberts Rocky Mountain Equipment Company, Inc. as a financially successful entity. From approximately 1980 until the time of filing for Chapter 11 protection, the following reasons led to the financial difficulty of the business:

A. The fact that the Debtor was not allowed to service or sell parts for Caterpillar engines. Caterpillar engines are presently being used in Ford heavy trucks. Historically, Roberts Rocky Mountain

Equipment Company, Inc. has sold and serviced a great number of Ford heavy trucks.

B. Related to the above problem is adverse publicity which arose from an alleged libelous letter which Long Machinery of Missoula wrote about Roberts Rocky Mountain Equipment Company, Inc. in 1982.

C. The decline of the mining, logging and agricultural industry in Western Montana, which resulted in lack of demand for new products, and an attendant inability to finance the purchase of new or used products by the consumer due to extremely high interest rates. There have been faint signs of some improvement in the mining industry, evidenced by a recent start-up of the Continental Mine in Butte and by a general, but undocumented, feeling of a better retail climate in the area. Nevertheless, the industries are not comparable to the situation compared to the mid–1970's. From the local mining venture, Roberts expects little or no business because the owner is organized vertically, with its own supplier of parts and equipment.

D. Extremely high interest rates were incurred by the Debtor. In August, 1981, it was necessary that the Debtor obtain re-financing of its business. In an effort to stay in business, the Debtor obtained financing from the SBA, but was required to pay interest at an exorbitant rate of 23.25% during the early part of the loan. As a result, since August, 1981, Roberts Rocky Mountain Equipment Company, Inc. has paid the amount of $290,138.33 in interest on the SBA loan, while barely reducing the principal.

E. The inability of local Butte banks to assist in dealer financing. This problem related not only to the financial condition of the Debtor caused by lack of consumer demand and high long term interest rates, but also to a retrenchment by local financing institutions in lending to businesses in the Silver Bow area market where the risk was considered too great.

The Debtor has attempted to deal with the above problems in the following manner:

1. Lawsuit for damages caused by defamation has been filed against Long Machinery Company and a lawsuit for violation of unfair trade practices law has been filed against Caterpillar. Recovery from those litigations is speculative.

2. The decline of the various industries has been met by an attempt to sell more equipment to smaller customers rather than large industries.

3. Direct sales to ranching and logging industries have been kept to a minimum to reduce costs, and sales are advertised in trade magazines to gain exposure at reduced costs.

4. While interest rates have now dropped, the Debtor has tried to remain on a non-borrowing policy on short term loans, yet cash flow is very limited due to increased governmental imposed costs. As a result, as interest rates declined, this small business is met with increased costs imposed by state and federal laws, such as increased taxes for social security, Worker's Compensation, unemployment and personal property.

5. The Debtor is attempting to expand into other types of business ventures. One major endeavor is to begin fabricating transport containers for shipping companies and other entities in need. Presently the Debtor has made a bid to the country of China to fabricate a large number of shipping containers, and negotiations have begun with a local trucking company to fabricate containers for that entity. Thus, there is evidence the Debtor is not standing still in the competitive marketplace.

The principal products of Roberts Rocky Mountain Equipment Company, Inc. include Nissan lift trucks, Detroit Diesel engines, Cummins engines, Mack trucks and a variety of smaller new equipment lines in addition to all types of used equipment and parts. Sales of new equipment in 1986 were non-existent. The absence of inventory and low demand has led the Debtor to concentrate on sales of consigned goods and used equipment, with increased emphasis upon sale of parts and service.

The principal services are maintenance and repair of all types of large trucks and

equipment and sale of parts for equipment. Methods of operation include sales through over-the-road sales personnel, office sales, maintenance road calls, in-house service and sales of counter parts. While sales volume of new and used trucks and equipment has continued to decline, sales in dollars of parts and service have remained fairly steady.

A decline in profit has occurred from 1984 to 1986 by about $60,000.00, partly due to the fact that the Debtor has had to pay for most part shipments on a COD basis so that the net profit margin on parts is therefore decreased. It is the business plan of the Debtor under reorganization that cash flow will be improved by freeing up cash proceeds of the sale of equipment to allow the Debtor to go on a 30 day basis on parts so that the high cost of COD will not be incurred. As evidence of a turn-around, for the 12 month period ending February, 1987, the Debtor showed a substantial increase in profit to $145,789.00 based on sales of over $900,000.00.

The Debtor has fixed a going concern value on its assets other than real property as follows:

| | | |
|---|---|---|
| Inventory | – | $312,000.00 |
| Equipment | – | 208,868.51 |
| Accounts Receivable | – | 69,000.00 |
| Total | | $589,868.51 |

Under the plan, the principal shareholder of the Debtor will transfer into the corporation the land and buildings valued at $400,000.00, against which is owed $40,000.00 on a Contract For Deed and $74,000.00 mortgage. Thus, a net equity infusion of capital in kind of $286,000.00 will increase the net asset and fair market value of the Debtor's business assets to $989,868.51.

Secured and priority claims against the assets of the reorganized company will be the following:

| | | |
|---|---|---|
| SBA | – | $450,025.39 |
| IRS | – | 140,532.11 |
| Miners Bank | – | 40,000.00 |
| Montana Department of Revenue | – | 34,199.25 |
| Silver Bow County | – | 26,214.56 |
| First Citizens Bank | – | 74,582.00 |
| CIT Corporation | – | $ 17,668.94 |
| | | $783,222.25 |

All secured creditors are fully secured by liens against the property of the Debtor.

Before discussing the objections of SBA and IRS to the Plan, certain principles dealing with confirmation of a Chapter 11 Plan of Reorganization should be restated. I quote from *In re Martin*, supra, at 925–26:

"Certain principles dealing with confirmation of a Chapter 11 Plan are well established. Regardless of whether a valid objection to confirmation has been asserted, the Code imposes upon the Court the responsibility and duty to determine whether the requirements of Section 1129(a) have been met. As stated in *In Re Holthoff*, 58 B.R. 216, 218 (Bankr.E.D.Ark.1985):

'In addition to the consideration of objections raised by creditors, the Court has a mandatory independent duty to determine whether the Plan has met all of the requirements necessary for confirmation. *In Re Coastal Equities, Inc.* 33 B.R. 898 (Bankr.S.D.Cal.1983); *In Re White*, 41 B.R. 227 (Bankr.M.D. Tenn.1984); *Matter of Nikron, Inc.*, 27 B.R. 773 (Bankr.E.D.Mich.1983).'

Further as held in *In re Prudential Energy*, 58 B.R. 857, 862 (Bankr.S.D.N.Y. 1986):

'[D]ischarging this responsibility does not entail investigation of the Debtor. But it does require the Court to require sufficient documentation to be submitted and to ask appropriate questions concerning the requirements of Section 1129(a).'

Clearly then, confirmation may not be allowed without full satisfaction of each of the requirements of Section 1129(a) and (b), and on this issue, the Debtors have the burden of proof. *In re Prudential Energy, Id.* at 862.

\* \* \* \* \* \*

The Plan must be feasible, that is, confirmation of the Plan under Section 1129(a)(11) is not likely to be followed by liquidation or the need for further reorganization of the Debtors. *In re Prudential Energy*, supra, holds at 862–63:

'Guaranteed success in the stiff winds of commerce without the protection of the Code is not the standard under 1129(a)(11). Most Debtors emerge from reorganization with a significant handicap. But a plan based on impractical or visionary expectations cannot be confirmed. (Citing cases and authority). All that is required is that there be a reasonable assurance of commercial viability. *In Re Trail's End Lodge*, 54 B.R. [898] at 904 [Bankr.Vt.1985].'

Further, *In re Clarkson*, 767 F.2d 417, 420 (8th Cir.1985), states:

'* * * The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts. *In Re Bergman*, 585 F.2d 1171, 1179 (2nd Cir.1978) (quoting 9 *Collier on Bankruptcy* at 1139). Pertinent factors to be considered include the business's earning power, the sufficiency of the capital structure, economic conditions, managerial efficiency, and whether the same management will continue to operate the company. *In Re Great Northern Protective Services, Inc.*, 19 B.R. 802, 803 (Bankr.W. D.Wash.1982).' "

One of the objections of IRS and SBA involve application of Section 1129(b) of the Code, known as the cram-down provision, which applies the fair and equitable test to creditors and the "absolute priority" rule. By definition, the absolute priority rule provides that a dissenting class of unsecured creditors must be provided for in full before any junior class such as stockholders can receive or retain any property under the Plan. *In re Martin*, supra, at 929. An exception to the rule, however, has been recognized and developed in *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106, 121, 60 S.Ct. 1, 10, 84 L.Ed. 110 (1939), where the court stated:

"It is, of course, clear that there are circumstances under which stockholders may participate in a plan of reorganization of an insolvent debtor. This court, as we have seen, indicated as much in *Northern Pacific Railway Co. v. Boyd*, supra, [228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931] and *Kansas City Terminal Ry. Co. v. Central Union Trust Co.*, supra [271 U.S. 445, 46 S.Ct. 549, 70 L.Ed. 1028]. Especially in the latter case did the court stress the necessity, at times, of seeking new money 'essential to the success of the undertaking' from the old stockholders. Where that necessity exists and the old stockholders make a fresh contribution and receive or retain a participation reasonably equivalent to their contribution, no objection can be made."

*In re Marston*, 13 B.R. 514, 517–518 (Bankr.E.D.N.Y.1981), held that contribution of new capital necessary to fund a reorganization plan, in money's worth, did not violate the fair and equitable test, even though an intervening class of creditors received nothing under the Plan. The case law is summarized in *In re Ahlers*, 794 F.2d 388, 402 (8th Cir.1986), which held:

"Thus, a more accurate summation of the absolute priority rule would be that a dissenting class of unsecured creditors must be provided for in full before any junior class may receive or retain any property under the plan, unless the junior class contributes to the reorganization enterprise something that is reasonably compensatory and is measurable."

█ The objection of SBA and IRS of the fair and equitable test is based on the Plan provision which calls for payment to Joe H. Roberts of $625.00 per week to retire his loans made to the company. The fair and equitable test, and thus the absolute priority rule, is satisfied in this case for two reasons. First, the class of unsecured creditors have not dissented to the Plan, but have accepted the Plan, and thus have agreed to the Robert's payment, even though as an insider stockholder he is a junior class to the unsecured creditors. Second, Roberts individually is contributing equity in the land and improvements of $286,000.00 to the reorganized Debtor, which sum exceeds his debt by $40,000.00. This contribution by the junior class (Roberts) allows him to participate in the Plan of Reorganization before the unsecured

creditors, who will receive 10% payment of their claims over 10 years at 6% interest.

■ Next, the SBA challenges the Plan on the basis that a corporate life insurance policy pledged to SBA will be surrendered for paid-up insurance, and due to such fact, SBA's security will be substantially eroded. The reason for surrender of the corporate life insurance policy is to reduce the company's expense by $4,000.00 per month, which is the amount of premium of the policy. SBA makes no valid argument to this cost saving measure. Clearly, such reduction in expense makes the Plan more feasible, and frees up additional cash for payments to creditors. Moreover, without the insurance policy, SBA is still fully secured by its mortgage lien on the equipment, accounts receivable, inventory and the new mortgage on the land. Under 1129(b)(2)(A)(i), the Plan may be confirmed if the secured creditor, such as SBA, retains a lien securing the amount of its allowed claim and it receives deferred cash payments having a present value, as of the effective date of the Plan, equal to the present value of the collateral. *In re Martin*, supra, at 927. Payments to SBA under the Plan will be in the amount of $3,776.60 per month, for 25 years at 8½%. SBA does not challenge the restructured term or interest rate. And since the interest rate is usually prima facie evidence of the discount rate, the SBA does receive under the Plan present value of its collateral in deferred cash payments. *In re Martin*, supra, at 927. Indeed, SBA is oversecured, and it will retain under the Plan not less than it would receive if the Debtor's collateral were liquidated under Chapter 7. The same is true to the secured portion of the secured claim of IRS.

■ IRS complains that post-petition withholding taxes will not be paid under the Plan. The Plan, however, provides for a payment to IRS of $75,000.00 cash upon confirmation, which not only covers any delinquent post-petition taxes, but also a sizeable payment against its secured and priority claim. In addition, IRS will be paid the balance of its claim over 48 months at 9% interest, in monthly installments of $3,640.67, plus 10% of the net proceeds of all inventory sold during the period of the term required to pay the IRS claim. IRS is treated in part as a priority tax claimant. In addition, based upon its lien filings, its secured claim will be secured by 10% of the value of the equipment inventory of the Debtor. The claim will be paid over a period not exceeding six years after the date of tax assessments, in deferred cash payments equal to the amount of its claim, as required by 1129(a)(9)(C) of the Code. Therefore, IRS has no valid legal objections to the Plan which can be sustained by the Court.

■ In reviewing the Plan, I find it is feasible. The change in direction of sales of products and service, reduction of costs and expenses, including labor and life insurance premiums, together with substantial likelihood of continual sales volumes and continuity of management, leads me to conclude that, as a practical matter, those things which the Plan proposes to be done can be done. There is a reasonable assurance of commercial viability and neither IRS nor SBA has presented any credible evidence to the contrary. The cause which resulted in the financial dilemma of the Debtor has in large measure been reversed. To restate from *In re Martin*, supra, at 931:

> "The duty of this court, being one primarily of equity, is to protect all creditors' interest, especially those who do not have collateral adequate to protect their repayment of debt, as long as the Code requirements are satisfied by the Plan, which is true in this case. Express Congressional policy in favor of rehabilitation, with attendant protection of secured creditors' interest and bargain, lead this Court to conclude the Debtors' plan of reorganization as a going concern satisfies the letter and spirit of the Bankruptcy Code."

The specious objections of SBA and IRS should not stand in the way of the reorganization efforts of Roberts Rocky Mountain Equipment Company to pay its creditors and continue in business in Montana.

After notice and hearing, I conclude:

1. That the Plan complies with the applicable provisions of Chapter 11 of the Code;

2. That the proponents of the Plan comply with the applicable provisions of the Code;

3. That the Plan has been proposed in good faith and not by any means forbidden by law;

4. (A) That any payments made or promised by the Debtor for services or costs and expenses in connection with the case, or in connection with the Plan and incident to the case, have been disclosed to the court;

(B) Any such payment made before confirmation is reasonable;

5. (A) Debtor has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtor, and appointment to or continuance in such office of such individual, is consistent with the interest of creditors and equity security holders and with public policy;

(B) That Debtor's Plan discloses the identity of any insider that will be employed or retained by the reorganized Debtor and the nature of cooperation of such insider;

6. With respect to each class:

(A) Each holder of a claim or interest of such class has accepted the Plan or will receive or retain under the Plan an account of such claim or interest property of a value, as of the effective date of the Plan, that is not less than the amount that such holder would so receive or retain if the Debtor was liquidated under Chapter 7; or

(B) Under Section 1129(b)(2) of the Code, each holder of a claim of such class will receive or retain under the Plan an account of such claim property of a value as of the effective date of the Plan, that is not less than the value of such creditor's interest in the estate's interest in the property that secures such claims;

7. With respect to each class, such class has accepted the Plan or the Plan provides that:

(A) With respect to a claim of a kind specified in Sections 507(a)(1) or 507(a)(2) of the Code, on the effective date of the Plan, the holder of the claim will receive on account of such claim cash equal to the allowed amount of such claim.

(B) With respect to a class of claims of a kind specified in sections 507(a)(3), 507(a)(4), 507(a)(5) or 507(a)(6) of the Code, each holder of a claim of such class will receive, if such class has accepted the Plan, deferred cash payments of value, as of the effective date of the Plan, equal to the allowed amount of such claim; or, if such class has not accepted the Plan, cash on the effective date of the Plan equal to the allowed amount of such claim; or

(C) With respect to a claim of the kind in Section 507(a)(7) of the Code, the holder of such claim will receive on account of such claim deferred cash payments, over a period not exceeding 6 years after the date of assessment of such claim, of a value, as of the effective date of the Plan, equal to the allowed amount of such claim; or

(D) With respect to each class of secured creditors who are impaired under the Plan and have not accepted the Plan, the Plan does not discriminate unfairly and is fair and equitable with respect to each class and the Plan complies with Section 1129(b)(2)(A) of the Code;

8. At least one class of claims has accepted the Plan, determined without including any acceptance of the Plan by an insider holding a claim of such class;

9. No regulatory commission with jurisdiction is involved in the Plan.

10. Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtor or any successor debtor under the Plan, unless such liquidation is proposed in the Plan.

IT IS ORDERED Debtors' Chapter 11 Plan of Reorganization is confirmed.