**In re TURNER ENGINEERING, INC., Debtor.**

**Bankruptcy No. 89–30805–011.**

United States Bankruptcy Court, D. Montana.

Dec. 28, 1989.

Jon R. Binney, Milodragovich, Dale & Dye, P.C., Missoula, Mont., for Racal Filter Technologies, Ltd.

Neal G. Jensen, U.S. Trustee, Great Falls, Mont.

Robert M. Murdo, Helena, Mont., for debtor.

Pace & Kennedy, Los Angeles, Cal., for Racal Filter Technologies, Ltd.

Don McClaine, Covington, Ky., for Mining Safety Appliances.

W. Arthur Graham, Graham & Reep, Missoula, Mont., for Unsecured Creditors Committee.

Donald MacDonald, IV, Missoula, Mont., for Farmers State Bank.

Robert J. Brooks, U.S. Attorney's Office, Missoula, Mont., for U.S. Army.

## ORDER OF CONFIRMATION OF DEBTOR'S AMENDED CHAPTER 11 PLAN

JOHN L. PETERSON, Bankruptcy Judge.

In this Chapter 11 case, hearing was held on due notice to all parties of interest on confirmation of two competing Plans of Reorganization, one proposed by the Debtor, and the other proposed by the official Unsecured Creditors Committee. Ballots filed with the Clerk show as follows:

A. Acceptance of Debtor's Plan

| CLASS | CREDITOR | AMOUNT | BALLOT |
|---|---|---|---|
| II | Farmers State Bank | $483,152.63 | Accepts |
| IV | CIT Group/Equip. Fin., Inc. | 89,689.00 | Accepts |
| VII | Bennett Machine & Stamping Co. | 82,704.42 | Accepts |
| VII | Braggingold & Co. | 5,295.77 | Accepts |
| VII | Champion Rubber Products Co. | 4,226.11 | Accepts |
| VII | Erisco Industries, Inc. | 9,200.81 | Accepts |
| VII | Ronald Paul Foltz, CPA | 8,000.00 | Accepts |
| VII | Jelliff Corp. | 89,635.60 | Accepts |
| VII | Mid–Valley Disposal | 424.50 | Accepts |
| VII | Jackson, Murdo & Grant, P.C. | 42,556.83 | Accepts |
| VII | Rowe Pain Mfg. | 335.78 | Accepts |
| VII | Town of Stevensville | 196,576.98 | Accepts |
| VII | Patsy Turner | 3,069.91 | Accepts |
| VII | Terence R. Turner | 4,690.30 | Accepts |
| VII | Terence R. Turner | 32,052.33 | Accepts |
| VII | Tim Turner | 245,000.00 | Accepts |

| CLASS | CREDITOR | AMOUNT | BALLOT |
|-------|----------|--------|--------|
| VII | Wyckman's | 888.90 | Accepts |
| VII | Fortman Truck Line | 107.70 | Accepts |
| VII | Thomas Publishing Co. | 195.00 | Accepts |
| VII | Clerence Popham | 2,825.00 | Accepts |
| VII | Patrick Collins | 720.00 | Accepts |
| VII | ASARCO, Inc. | 1,483.95 | Accepts |
| VII | Stevi Auto Parts | 543.07 | Accepts |
| VII | Bitterroot Farm & Builder | 1,101.61 | Accepts |
| VII | ADS Finance Services, Inc. | 227.81 | Accepts |
| VII | Allied Tech. Sales, Inc. | 176.54 | Accepts |
| VII | Analizing, Inc. | 500.00 | Accepts |
| VII | Ball Corporation | 15,386.83 | Accepts |
| VII | Bitterroot Company & Cleaners | 605.12 | Accepts |
| VII | Fiber–Resin Corp. | 1,551.52 | Accepts |
| VII | Plymouth Tube Company | 10,235.28 | Accepts |
| VII | Boston Felt Company | No Amount | Accepts |
| VII | Teton Machine Company | 5,086.08 | Accepts |
| VIII | Davidson Metals, Inc. | 56,891.19 | Accepts |
| IX | Philip G. Belangie | N/A | Accepts |

B. Acceptance of Unsecured Creditor's Committee Plan

| CLASS | CREDITOR | AMOUNT | BALLOT |
|-------|----------|--------|--------|
| III | Robert M. Schoenman | $ 39,300.00 | Accepts |
| VI | Air Products & Chem., Inc. | 81.60 | Accepts |
| VII | Brown Cor, International | 132.27 | Accepts |
| VII | Cathy Hilde | 1,175.44 | Accepts |
| VII | Ellesco, Inc. | 100,000.00 | Accepts |
| VII | Herron Testing Lab | 3,680.00 | Accepts |
| VII | McKey Perforating Co, Inc. | 19,948.55 | Accepts |
| VII | Mac's Machinery Sales, Inc. | 1,146.43 | Accepts |
| VII | Northwestern Interface, Inc. | 1,500.00 | Accepts |
| VII | Olympic Scientific, Inc. | 467.40 | Accepts |
| VII | Lake City Forge, Inc. | 45,473.52 | Accepts |
| VII | US West Communications | 440.03 | Accepts |
| VII | Andersen Engineering | 407,676.68 | Accepts |
| VII | City Electric | 500.00 | Accepts |
| VII | Dialog Information Services, Inc. | 151.87 | Accepts |
| VII | Robert Sepe | 2,769.25 | Accepts |

Two creditors, Keystone Airline Corp., and Alex Horizen, filed ballots without indicating a preference for either Plan. Secured creditor, CIT Corporation, voted conditionally for the Debtor's Plan, but indicated on its ballot that if the Court determines that a novation with the U.S. Army will favor Racal Technologies, it would then prefer the Plan of the Unsecured Creditors Committee. In Class VII of Debtor's Plan (unsecured creditors), ballots of 31 in number totalling $765,403.75, with no rejections, favor the Plan. In Class VII of the Unsecured Creditors Committee Plan, ballots of 11 in number totalling $407,676.68, with no rejections, favor that Plan. At least one impaired class has affirmatively voted in favor of each Plan, so that Section

1129(a)(10) of the Code is satisfied as to both Plans. *In re Douglas Hereford Ranch, Inc., et. al.,* 76 B.R. 781 (Bankr. Mont.1987). All classes are impaired in each Plan in that their legal rights are modified by each Plan. *In re Acequia,* 787 F.2d 1352, 1363–64 (9th Cir.1986). As can be seen from the balloting, no creditor voted to reject either Plan, so that the affirmative acceptance by each unsecured class satisfies 11 U.S.C. § 1126. Indeed, all classes have accepted each Plan, and thus, § 1129(a)(8) and (10) are satisfied as to each Plan.

On November 13, 1989, the Debtor filed its disclosure, and filed amendments thereto on December 1, 1989. The Unsecured Creditors Committee filed a Disclosure Statement on December 1, 1989, which basically incorporated the Debtor's disclosure statement, and a revision to each disclosure statement was filed on December 28, 1989. Both disclosure statements were approved by the Court and distributed to the creditors with each proposed Plan of Reorganization.

Debtor is a military contractor with its principle place of business at Stevensville, Montana. Debtor had four contracts with the U.S. Department of Defense to manufacture and supply various military products. Two of the contracts relate to production of C–1 gas mask filters. Under both Plans of reorganization the Debtor would assume one contract (0686) and agree to termination of the other C–1 contract. The largest, and third contract, awarded to the Debtor is the C–2 contract (DAAA 09–89–C–0183), which calls for the manufacture and production of 900,000 gas mask canisters. It is this contract, described later, which provides the basis of the difference in the two competing Plans of Reorganization. The fourth government contract involves the manufacture and production of M825 smoke canisters (DAAA 09–88–C–0711). Both plans call for the Debtor to continue production under such contract by producing 8,000 masks per month beginning in early 1990. It is envisioned in both Plans that if such production quotas can be achieved, the Debtor would be in a position to secure additional M825

contracts, from which source of payment it would fund the balance of payments to creditors. Aside from machinery, equipment, inventory and building, the only other asset of the Debtor is a claim against the United States Government pending in the Court of Claims over termination of two other military contracts. These two contracts form the basis of a disputed claim by the government.

The heart of controversy between the two Plans involves the proposed sale of the C–2 contract in order to generate funds to pay creditors in part, and then use the balance of the purchase price to continue production of the M825 smoke canisters. The Debtor proposes to sell the C–2 contract to Mine Safety Appliances (MSA) for the sum of $1,600,000.00, less credits, while the Unsecured Creditors Committee proposes to sell such contract to Racal Filter Technologies, Inc. (Racal) for $1,800,000.00, less credits. Both MSA and Racal are competitors of the Debtor in the C–2 canister business, with both companies presently under contract with the Department of the Army to supply C–2 canisters. With the sale of the C–2 business, Debtor would restrict its principle operation to production of smoke canisters, for which there are only two companies currently manufacturing such product. Debtor believes that it will be able to obtain new contracts for the smoke canisters at a price sufficient to fund a successful reorganization plan. Under each Plan the secured and priority creditors will be paid in full and unsecured creditors will have the option to receive an upfront partial payment of each claim, and fifty percent payment of the balance within 3 years, or preferred stock issued for the balance of each unsecured claim so that the balance of the claim would be paid from profits in the fourth and fifth year. Under the Debtor's Plan, the sale of the C–2 contract to MSA would generate, upon approval of a novation by the Department of the Army, a net amount of $1,487,000.00. Under the Unsecured Creditors' Plan, it proposes the Debtor sells the C–2 contract to Racal for a net sum of $1,636,000.00, again to be paid upon acceptance of a novation by

the Army. By reason of the difference in purchase price, the Debtor's Plan calls for a payment to the unsecured creditors of 13 percent of each allowed claim within 30 days of the receipt of the funds, while the unsecured creditors plan would pay 23 percent of each allowed claim within the same time period. Both plans propose the same provisions for payment of the balance of each claim, depending whether the creditor selects Option A, which calls for 50 percent of the balance of the claim to be paid by June 30, 1992, without interest, or Option B, which calls for 50% of the balance of each claim to be paid by June 30, 1992, and the remaining 50 percent to be paid by issuance of Class C preferred stock until the claim is paid from profits. Each creditor has 15 days after confirmation to elect as to each option. Another aspect of financing the Plan involves a lender called Netley, Ltd., which has advanced during the course of administration, loans of close to 1 million dollars, for which Netley will be issued stock in the reorganized company. No objections have been filed to either Plan, rather the testimony at the confirmation hearing developed around the issue as to which prospective purchaser, MSA or Racal, would better be able to secure a novation agreement with the Army in the most expeditious time frame so as to satisfy the Debtor's need for financing future operations of the M825 contract.

Racal's position is that it is presently able to deliver to the Army a substantial quantity of C–2 canisters by February 1, 1990, and has the present equipment and inventory to produce and deliver within the same time frame a portion of supply under the Debtor's contract. Racal makes much of the fact that Debtor's equipment for producing the canisters has not been tested and approved (called first article testing). MSA has present capacity to deliver its contract supply, but may need additional equipment to be purchased from the Debtor to satisfy the Debtor's supply contract. The Debtor's chief executive officer gave the opinion that MSA would be more likely to secure a timely novation agreement than Racal, and emphasized that under either proposal, prompt action by the buyer is necessary in order for the Debtor to avoid default under the M825 contract. MSA contends the Debtor's C–2 contract may not be assignable to Racal since it would allegedly violate sole source supplier regulations of the Army which govern novation. Racal counters that such is simply not true, and in fact, the supply situation for canisters has changed so drastically since bid solicitations were made in 1988 that the Army must act with haste to secure a supplier. It is obvious from the record that a successful, and timely novation is necessary to implement either Plan of Reorganization.

While Racal's purchase price is $180,-000.00 higher than MSA, the question before the court as to which Plan to confirm depends in a Chapter 11 case on creditor's acceptance more than any other factor. I conclude from the testimony that since both Racal and MSA have already been awarded C–2 canister contracts by the Army, and the evident need for such canisters is apparent, that either prospective purchaser should be awarded a novation agreement under the applicable federal regulations. The Army's position at the hearing was that it is a condition precedent to consider a novation request that the Court approve the sale of such asset to one of the prospective purchasers. Such approval would necessarily occur by confirmation of one of the two proposed Plans.

Section 1129(c) provides the court may confirm only one Plan, and "the Court shall consider the preference of creditors and equity security holders in determining which Plan to confirm."

The final decision as to which Plan to confirm should be influenced by the holding of *In re Rolling Green Country Club*, 26 B.R. 729 (Bankr.Minn.1982), where the Court was faced with competing Chapter 11 Plans of Reorganization—one by the Debtor, and the other by a secured creditor. The Court stated:

"As previously indicated, the creditors' committee while adhering to its objections to the First Bank plan has withdrawn and does not object to the debtor's plan. In this situation, the court is

bound to consider those expressed preferences of the creditors in its determination as to which plan to confirm such consideration being mandated by Section 1129(c). While the court is of course free to make its own determination having taken into account such preferences there is nothing in the present situation which the court feels is compelling to the contrary. Accordingly the First Bank plan while confirmable should not be confirmed and the plan of the debtor being not only confirmable but meeting the preference of creditors should be confirmed. The following additional findings are intended to that end." *Id.* at 735.

In another case, *In re Werth,* 29 B.R. 220 (Bankr.Colo.1983), the court considered the issue whether the debtor may propose more than one plan to the creditors. Concluding such was permissible under § 1121(a), the Court again indicated that creditor's preference should be looked to in deciding which plan to confirm.

"I see no reason to preclude the opportunity to allow creditors to make an immediate choice with respect to their preference between two plans instead of submitting first one to be followed by another in the event of rejection. The Court can, of course, confirm only one plan pursuant to 11 U.S.C. § 1129(c). * * * Thus, in allowing the debtor to submit multiple plans, the equity holders and claimants are in no way precluded from submitting their own plan." *Id.* at 222.

Accord: *In re Media Central, Inc.,* 89 B.R. 685 (Bankr.E.D.Tenn.1988). As stated in 5 *Collier on Bankruptcy,* ¶ 1129.04, P. 1129 —96 and 97 (15th Ed):

"Given the background of Section 1129(c), the Court should refrain from imposing a Plan on parties if a majority of holders of claims and interests entitled to participation express a preference for a different Plan."

■ An important aspect of Chapter 11 Confirmation is the right of a creditor to vote its preference, because it is the creditor's destiny which is at stake, as well as the equity security holders. Once the Dis-

closure Statement has been approved, solicitation by a proponent of a Plan is permissible. Bankruptcy Rule 3017(d). Rule 3017(d) makes it mandatory that a ballot be transmitted with the Plan so the creditor and equity security holder may vote their preference. *Media Central,* supra, at 689. In the case *sub judice,* the balloting by unsecured creditors shows an overwhelming acceptance of the Debtor's Plan. A total amount of $765,403.75 by 31 unsecured creditors voted to favor the Debtor's Plan, while 14 unsecured creditors totalling $585,061.44 in dollar amount voted for the alternative Plan submitted by the Unsecured Creditors Committee. The ballots for the latter Plan show the total dollar volume is somewhat skewed by the ballot of Anderson Engineering in the sum of $407,676.68. In addition, the sole stockholder voting cast his ballot in favor of the Debtor's Plan. *Collier,* supra, also states the Court should also give weight to ownership interests as well as considering that the purpose of the Code is to allow the Debtor to sucessfully reorganize. Aside from the consideration of creditor's preference, the amount which the creditors will receive up front varies by $180,000.00 due to the difference in purchase price of the C–2 contract. In sum, the unsecured creditors will receive about 8% less on each claim between the two Plans. The creditors however, were made aware of such difference in the Disclosure Statement, and notwithstanding, the majority selected the Debtor's Plan of Reorganization. All matters considered, I find that creditor preference as submitted by ballots should be the element which tips the balance in favor of confirmation of the Debtor's Plan of Reorganization.

■ The application of creditor's preference to opposing Plans should not be confused with the obligation of the court to determine whether the Plan is confirmable, i.e., that it meets the confirmation standards of § 1129(a). As stated in *In re Holthoff,* 58 B.R. 216, 218 (Bankr.E.D.Ark. 1985):

"In addition to the consideration of objections raised by creditors, the Court has a

mandatory independent duty to determine whether the Plan has met all of the requirements necessary for confirmation."

Accord: *In re Roberts Rocky Mountain Equipment Co., Inc.,* 76 B.R. 784, 789 (Bankr.Mont.1987). In accordance with that duty, I conclude, based on the uncontradicted testimony of the debtor, that each element of § 1129(a) has been satisfied under the Debtor's Plan of Reorganization. The Plan is feasible if the M825 contract component is successfully completed by funding from the sale of the debtor's C–2 canister contract and future successful acquisitions of additional M825 contracts. All parties recognize such eventuality, and none have voiced any objection to the Debtor's financial projections, which I find reasonable.

I conclude the Debtor's Amended Plan of Reorganization, which entails among other matters, sale of the C–2 canister contract to Mine Safety Appliances, should be confirmed, and with such confirmation, the sale of such asset under a Novation agreement between Mine Safety Appliances and the Department of the Army is approved.

I therefore conclude pursuant to 11 U.S.C. Section 1129:

(1) The Plan complies with the applicable provisions of this title. (Title 11).

(2) The proponent of the Plan complies with the applicable provisions of this title.

(3) The Plan has been proposed in good faith and not by any means forbidden by law.

(4) Any payment made or to be made by the proponent, by the Debtor, or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with, the case, or in connection with the Plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable; and

(5)(A)(i) The proponent of the Plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtor, an affiliate of the Debtor participating in a joint plan with the Debtor, or a successor to the Debtor under the Plan; and

(ii) the appointment to, or continuance in such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and

(B) the proponent of the Plan has disclosed the identity of any insider that will be employed or retained by the reorganized Debtor, and the nature of any compensation for such insider.

(6) Any governmental regulatory commission with jurisdiction, after confirmation of the Plan, over the rates of the Debtor has approved any rate change provided for in the Plan, or such rate change is expressly conditioned on such approval.

(7) With respect to each impaired class of claims or interests—

(A) each holder of a claim or interest of such class—

(i) has accepted the Plan; or

(ii) will receive or retain under the Plan on account of such claim or interest property of a value, as of the effective date of the Plan, that is not less than the amount that such holder would so receive or retain if the Debtor were liquidated under Chapter 7 of this title on such date; or

(B) if section 1111(b)(2) of this title applies to the claims of such class, each holder of a claim of such class will receive or retain under the Plan on account of such claim property of a value, as of the effective date of the Plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

(8) With respect to each class of claims or interests—

(A) such class has accepted the Plan; or

(B) such class is not impaired under the Plan.

(9) Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the Plan provides that—

(A) with respect to a claim of a kind specified in section 507(a)(1) or 507(a)(2) of this title, on the effective date of the Plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

(B) with respect to a class of claims of a kind specified in section 507(a)(3), 507(a)(4), 507(a)(5) or 507(a)(6) of this title, each holder of a claim of such class will receive—

(i) if such class has accepted the Plan, deferred cash payments of a value, as of the effective date of the Plan, equal to the allowed amount of such claim; or

(ii) if such class has not accepted the Plan, cash on the effective date of the Plan equal to the allowed amount of such claim; and

(C) with respect to a claim of a kind specified in section 507(a)(7) of this title, the holder of such claim will receive on account of such claim deferred cash payments, over a period not exceeding six years after the date of assessment of such claim, of a value, as of the effective date of the Plan, equal to the allowed amount of such claim.

(10) If a class of claims is impaired under the Plan, at least one class of claims that is impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any insider.

(11) Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

(12) All fees payable under section 1930, as determined by the Court at the hearing on confirmation of the Plan, have been paid or the Plan provides for the payment of all such fees on the effective date of the Plan.

(13) The Plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of this title [11 USCS § 1114], at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of this title [11 USCS § 1114(e)(1)(B) or (g)], at any time prior to confirmation of the Plan, for the duration of the period the Debtor has obligated itself to provide such benefits.

(14) The provisions of Section 1129(b) have been satisfied in that the Plan does not discriminate unfairly, and is fair and equitable with respect to each class of claims or interests that is impaired under, and has not accepted, the Plan.

IT IS ORDERED that the Debtor's Amended Plan of Reorganization, filed December 28, 1989 is confirmed.

IT IS FURTHER ORDERED Debtor's Motion For Sale of Assets to Mine Safety Appliances is granted.