United States Atty.'s Office by Susan Cassell, and Nelson Chan, Philadelphia, Pa., for The Dept. of Housing & Urban Development.

Hannoch, Weisman, Stern, Besser, Berkowitz & Kinney by Jane Mathews, Roseland, N.J., for Leroy Shoesmith and Kenalty Corp.

Sills, Beck, Cummis, Zuckerman, Radin & Tischman by Robert A. Baime, Newark, N.J., for Debtor.

## OPINION

VINCENT J. COMMISA, Bankruptcy Judge.

The facts in this matter are as follows:

Water Gap Village [hereinafter the "Debtor"], a Limited Partnership of the State of New Jersey, filed a petition for reorganization under Chapter 11 of the Bankruptcy Code [hereinafter the "Code"], on February 16, 1983. Since the time of its Chapter 11 filing, the Debtor has operated its business as a debtor-in-possession. The Debtor's business involves the ownership and operation of residential townhouse units, which were constructed by the debtor and are located in the Borough of Delaware Water Gap, Monroe, Pennsylvania. Since construction of the townhouse complex in 1977, the Debtor has been engaged in the business of renting apartments in the townhouse units. The complex, situated on approximately 9.25 acres, consists

**In re WATER GAP VILLAGE, A Limited Partnership of the State of New Jersey, Debtor.**

**Bankruptcy No. 83–01021.**

United States Bankruptcy Court, D. New Jersey.

Oct. 18, 1985.

of one hundred (100) one and two-bedroom rental units.

The Debtor entered into a mortgage with Chemical Bank dated August 15, 1977. Chemical Bank lent the Debtor $2,415,000 to construct the Water Gap complex. The terms of said loan included an interest rate of 9% securing the mortgage and note which covered all realty, equipment and fixtures. The United States Department of Housing and Urban Development [hereinafter "HUD"] endorsed and insured the note pursuant to the National Housing Act, 12 U.S.C. Sec. 1701, *et seq.* HUD also guaranteed permanent financing for forty (40) years at the 9% interest rate.

In 1979, Water Gap defaulted under the terms of the mortgage and Chemical Bank assigned the mortgage to HUD. Thus, HUD holds a mortgage, mortgage note and security agreement.

On June 17, 1983, HUD commenced an adversary proceeding against the Debtor seeking relief from the automatic stay provision of the Code, 11 U.S.C. Sec. 362, *et seq.* HUD alleged in its Complaint that it held a secured claim in the amount of $2,962,835.71 against the Defendant-Debtor as of February 18, 1983. (Plaintiff's Complaint, Par. 3). Moreover, HUD alleged that Defendant-debtor was unable or unwilling to provide adequate protection to HUD thereby decreasing the value of HUD's interest in the property (Plaintiff's Complaint, Par. 5). The Court denied HUD's requested relief. However, on September 23, 1983, the Court ordered the Debtor to pay HUD monthly: one-twelfth ($1/12$) of the annual Real Estate Taxes due on the Water Gap project and one-twelfth ($1/12$) of the annual interest on $1,300,000, at the rate of thirteen percent (13%).

On September 19, 1983, the Debtor filed its Plan of Reorganization [hereinafter the "Plan"] and Disclosure Statement. On December 6, 1983, HUD filed Objections to The Reorganization Plan. HUD's objections to the Plan and the Plan's confirmation were based on the following assertions:

(A) Management—The Debtor did not make disclosure of the proposed post-confirmation management as required by the Code under Section 1129(a)(5);

(B) Liquidation—The Plan provided HUD with property of value less than it would have received if the Debtor was liquidated and therefore the Plan was not in compliance with the requirements of Section 1129(a)(7);

(C) Impairment—HUD as a member of two classes—Class Three-Secured Claims (wherein HUD is the Class's sole member) and Class Five-General Unsecured Claims (wherein HUD's claim exceeds $2/3$ of the unsecured debt)—finds its claim in each class impaired by the Plan. Further, HUD claims real estate taxes or a priority claim pursuant to Class Two which is not listed and therefore appears to be impaired and since HUD does not retain its pre-petition legal, equitable and contractual rights, it alleges that its interests and claims are impaired under Section 1124 of the Code. Thus, HUD finds the Plan unacceptable under Section 1129(a)(8) of the Code;

(D) Fair and Equitable—HUD urges that the present value of the New Mortgage offered by the Plan is less than the present value of the real estate collateral. This provision in the Plan renders it neither fair nor equitable under Section 1129(b)(2)(A)(i)-(II). So, assuming *arguendo* the Plan satisfies the requirements of Section 1129(a) of the Code, HUD's position is that it still may not be confirmed as it falls short of the fair and equitable requirement of Section 1129(b);

(E) Feasibility—HUD alleges that the Plan does not meet the feasibility standards of Section 1129(a)(11) of the Code because the Plan relies upon income not available to the Debtor such as: excess rents, tenant security deposits and application fees. Moreover, the Plan requires sources of funds whose availability is questionable, such as cash calls to limited partners. Further, HUD asserts that the Plan is not feasible from a regulatory standpoint because of past problems encountered with the Debtor and DHC Realty Corp. [herein-

after "DHCR"], the general partner of the Debtor and the management agent. Said problems, HUD maintains, will permit it to deny proposed rent schedules and may result in further regulatory and administrative action against the Debtor or DHCR;

(F) Cram Down—HUD alleges that the Plan does not comply with any of the requirements of Section 1129(a) of the Code other than paragraph (8), and consequently the Plan cannot be confirmed or "cram(ed) down" over the dissenting class by the Court under Section 1129(b)(1) of the Code. HUD specifically asserts that the Plan requires HUD to originate the Plan's proposed New Mortgage; something that HUD contends it has no statutory authority to do. Similarly, HUD contends that the Plan's proposed New Mortgage is not eligible for any currently authorized program with a subsidized interest rate and therefore HUD cannot be induced (by the Court) to fashion a program to implement the Debtor's Plan that would be in contravention of HUD's statutory authority;

(G) Good Faith—HUD alleges that neither the Petition nor the Plan were filed in good faith as required by Section 1129(a)(3) of the Code. HUD contends that the Debtor filed the Petition immediately before HUD was to exercise regulatory and administrative powers in the form of a request that the Debtor produce its books and records for examination pursuant to HUD's regulatory powers under the National Housing Act, 12 U.S.C. Section 1715–l(d)(3) and the Regulatory Agreement between HUD and the Debtor dated August 25, 1977, Para. 9(c). HUD alleges that it gave advance notice to, and on February 17, 1983, visited the offices of, DHCR for the purpose of inspecting the Debtor's books and records. HUD alleges that the Debtor requested HUD employees to leave the DHCR offices after approximately 15 minutes on counsel's advice. On February 18, 1983 the Debtor filed its Petition for Reorganization. HUD further alleges as indicia of lack of good faith the Debtor's refusal, for several months, to make available its books and records notwithstanding the exemption from the Automatic Stay provision of the Code, Section 362(b)(4) for regulatory actions of governmental units.

After the foregoing objections were filed, modifications were made to both the Plan and Disclosure Statement. On March 5, 1983, the Debtor filed a Modified Plan of Reorganization and on March 26, 1984 the Court entered an Order approving the Fourth Modified Disclosure Statement. Subsequently, balloting occurred and Class Four, an impaired class as designated under the Plan voted by the number required Section 1126(c) of the Code to accept the Plan.

Meanwhile, HUD filed Supplemental Objections to the Reorganization Plan. Further, on March 26, 1984 HUD filed objections to the Modified Reorganization Plan and on May 18, 1984 filed Supplement to Objections to the Modified Reorganization Plan.

On March 14, 1985, confirmation hearing on the Plan was held. The Court heard testimony and oral argument and reserved decision while requesting legal memoranda on the effect of *In re Braniff Airways, Inc.*, 700 F.2d 935 (5th Cir.1983) on confirmation of the Plan.

The issue the Court addresses herein is whether HUD's regulatory authority—which HUD Proposes to exercise by approving or disapproving management under the Plan—can be affected by the Court pursuant to the "cram down" provisions of the Code.

The case central to the issue at hand and relied upon by HUD is *Braniff, supra.* Therefore, a review of *Braniff* is in order here.

*Braniff* involved the attempt of Braniff Airways, Inc. to sell its "landing slots" and airport lease rights to another carrier (PSA). Prior to Braniff's Chapter 11 filing, the Federal Aviation Administration (hereinafter "FAA") due to the Air Traffic Controllers' strike, determined the maximum safe number of hourly arrivals at certain airports and allocated hourly "landing slots" among the airlines using the airports. Following Braniff's Chapter 11 fil-

ing, the FAA distributed to other carriers more than 100 of 450 slots previously allocated to Braniff. Subsequently, the Unsecured Creditors' Committee filed an application with the Bankruptcy Court to determine whether the FAA had violated the automatic stay under Section 362 of the Code when it allocated the former Braniff slots. The issue of whether the District Court (which earlier had approved the Braniff-PSA transaction in its review of the Bankruptcy Court's approval) had the power to order the FAA to allocate certain landing slots at various airports to Braniff so that Braniff could consummate its agreement with PSA, was decided by the Fifth Circuit Court of Appeals.

The Court of appeals noted that under the Federal Aviation Act, 49 U.S.C. Section 1301 et seq. [hereinafter the "Act"], the FAA was empowered to regulate the use of navigable airspace to insure the safety of aircraft and the efficient utilization of such airspace and that also under the Act, the FAA had "unquestionable authority for all aspects of airspace management." 700 F.2d at 941, citing S.Rep. No. 1811, 85th Cong., 2d sess. 14 (1958). The Court of appeals further mentioned that the Act was passed for the purpose of centralizing in one authority the power to make rules for the safe and efficient use of the nation's airspace. 700 F.2d at 941, quoting *Air Line Pilots Association, International v. Quesada*, 276 F.2d 892, 894 (2d Cir.1960). Moreover, the Fifth Circuit found it noteworthy that FAA regulations, in addition to insuring the safety of aircraft and the efficient use of such airspace, must take cognizance of such policies as national defense requirements as well as the encouragement of a competitive air transportation system and generally must regulate in response to the needs of the public. 700 F.2d at 941.

The Fifth Circuit dismissed Braniff's argument that since the landing slots are property of the estate under Sec. 105 of the Code, the Bankruptcy Court was empowered to issue whatever orders it thinks necessary to protect the property, specifically, the landing slots. The Court concluded that the slots were restrictions on the use of property, specifically, airplanes; not property in themselves. 700 F.2d at 942. The Court went a step further by saying that assuming *arguendo* the landing slots did give rise to some limited proprietary interest which, in turn, would confer jurisdiction over them by the Bankruptcy Court, it was well-established by a long line of authority that any transfer of a state or federal license or certificate is subject to the continuing jurisdiction and approval of the agency. *Id.*

The Fifth Circuit concluded its decision by stating:

At most, a determination that the slots were "property" might allow the debtor to transfer them to another carrier for purposes of the bankruptcy laws, but approval of that transfer under the Federal Aviation Act would rest solely with the FAA. *Id.*

HUD is an executive branch department of the United States Government. 42 U.S.C. Sec. 353(a). The department is administered under the supervision and direction of the Secretary of Housing and Urban Development [hereinafter the "Secretary]." *Id.* The National Housing Act [hereinafter "NHA"] is administered by HUD. 12 U.S.C. Sec. 1701 *et seq.*

In the instant matter, HUD asserts that it is primarily a mortgage insurer as opposed to a mortgage lender. (Post Confirmation Hearing Memorandum of HUD), p. 2). HUD also offers that it is a regulated statutory agency which can transact business only by statutory authority. (Transcript, Adj. Hearing Confirmation of Plan, 53:13–19). HUD further claims that before it achieved its present status of a creditor as a result of the assignment of the mortgage from Chemical Bank, it regulated the Debtor by way of HUD regulations and the Regulatory Agreement For Multifamily Housing Projects [hereinafter the "Regulatory Agreement"] (Post Confirmation Hearing Memorandum of HUD, p. 2.).

HUD cites as evidence of its regulatory function 24 C.F.R. Sec. 200.210, *et seq.* (1985) "Previous Participation Review and

Clearance Procedure" [Uniform standards established for approval, disapproval or withholding of action on principals based on, *inter alia* past performance] and 24 C.F.R. Sec. 24, *et seq.* (1985) "Debarment, Suspension and Ineligibility of Contractors, and Grantees; Administrative Sanctions" [Procedures relating to exclusion from participation in HUD programs]. (Objections to the Modified Reorganization Plan of HUD, p. 1–3 and Post Confirmation Hearing Memorandum of HUD, p. 2–6).

HUD asserts that because the Regulations entitle it to control a project's management, the Bankruptcy Court cannot require it to accept the Plan's proposed management. This, HUD maintains, is the focus of the *Braniff* case as applied to the instant matter. (Transcript 55:14–21). The *Braniff* case, however, is distinguishable herein and, consequently, does not provide authority in the instant matter.

In *Braniff*, the Fifth Circuit Court of Appeals emphasized that the FAA had unquestionable authority for all aspects of airspace management. 700 F.2d at 941. The Court, moreover, cited the FAA's "plenary authority in the matter of air traffic rules." *Id.*, quoting H.R.Rep. 2360, 85th Cong., 2d sess. 6–7 (1958), U.S.Code Cong. & Admin.News 1958, p. 3741.

Plenary authority means, of course, full and complete authority. So complete is the FAA's authority, that regulations are subject to only limited review in the courts of appeals. 49 U.S.C. Sec. 1486(a).

HUD in the instant matter has not proferred any argument that its regulatory authority is plenary. Admittedly, HUD regulates its lending, financing and insuring but it does so in the interest of fiscal prudence and to protect its financial position. Moreover, HUD concedes that it is in the business of lending or guaranteeing money. (Transcript 55:22–23). Logically, then, if HUD is in the business of lending or guaranteeing money it cannot be solely in the business of regulating as is the FAA. The Court in the *Braniff* case upheld the FAA's plenary regulatory authority when it re-

fused to subject the FAA to the jurisdiction of the Code.

No such plenary regulatory authority can be found existing for HUD in the instant matter. Therefore, HUD's status is that of government agency *qua* secured creditor. Consequently, the *Braniff* case does not address HUD's status as merely a secured creditor. Therefore, it is decided that HUD can be subject to the jurisdiction of the Code including, *inter alia*, the Section 1129 "cram-down" authority of this Court to confirm the Plan over its objection.

Submit an appropriate Order.