824

In re CAPITAL WEST INVESTORS, a
California Limited Partnership,
Debtor.

Employer's Tax Identification
No. 77–0060385.

Bankruptcy No. 93–53365–MM.

United States Bankruptcy Court,
N.D. California.

Feb. 13, 1995.

Craig M. Prim, Murray & Murray, Palo Alto, CA, for debtor.

Brendan Collins, U.S. Dept. of Justice, Washington, DC, for Dept. of Housing and Urban Development.

Richard G. Wise of Greenstein, De Lorme & Luchs, Washington, DC, for Reilly Mortg. Group, Inc.

Patric J. Kelly, San Jose, CA, for Mortg. Bankers Ass'n of America.

## OPINION

MARILYN MORGAN, Bankruptcy Judge.

### INTRODUCTION

On October 21, 1994, the Court confirmed the Chapter 11 plan of Capital West Inves-

tors, a California Limited Partnership, over the objections of Reilly Mortgage Group, Inc., the servicing agent on the first deed of trust, and The Mortgage Bankers Association of America (MBAA), as *amicus curiae*. Reilly sought reconsideration of the Court's order confirming the plan and was joined by the United States Department of Housing and Urban Development (HUD) as a party-in-interest. With respect to the arguments raised by Reilly and MBAA, the Court concludes that the plan satisfies the requirements governing plan confirmation in that it is fair and equitable and it is not proposed by any means forbidden by law. With respect to the arguments raised by HUD, the Court concludes that the plan is consistent with the fundamental goals of both the Bankruptcy Code and the National Housing Act.

## FACTS

Capital West owns and operates The Woods, an apartment complex in Fremont, California, which has been appraised at $7 to $9 million. Capital West acquired the property from Lincoln Park & Associates, Ltd. in 1985, assuming a note and first deed of trust held by Transamerican Investors Service Company. Transamerican's loan is now held by The Riggs National Bank of Washington, D.C. Riggs holds the note as part of a Federal Housing Act Project Loan Certificates Series Pool in which private individuals own and trade interests. Reilly is the servicing agent. The balance remaining on the loan is approximately $2,630,000.

The loan is insured by HUD. HUD operates the Federal Housing Act Home Loan Mortgage Insurance Program which insures against lender loss in the event of default by a borrower. This program enables lenders to provide loans with low down payments and interest rates lower than the conventional mortgage market. The terms of the mortgage insurance program require HUD to pay 99% of the loan balance and to take an assignment of the note in the event of default. When the loan originated in 1978, Lincoln Park & Associates Ltd. executed HUD's Regulatory Agreement which contains requirements conditioning the loan. A mortgagor that elects to participate in the mortgage insurance program agrees to be regulated by HUD through the loan documents and the Regulatory Agreement. *See* 12 U.S.C. § 1715*l* (d)(4)(iv) and 24 C.F.R. § 221.529 (1994). Capital West became bound by this agreement when it assumed the loan.

Relevant to the issues at confirmation, the agreement required payment of monthly mortgage insurance premiums to HUD. The payment for June 1994 was $1,070.13; payments were to continue to decline each month for the term of the loan. The agreement also contained "surplus cash" provisions. Surplus cash are those funds remaining after and every obligation of the project, including maintenance, has been satisfied. Surplus cash may only be disbursed on an annual or semi-annual basis after submission of an audited financial statement. The Regulatory Agreement also provided that no junior financing could be placed without HUD's approval.

HUD approved placement of a second deed of trust held by Trilex Financial Services. The Trilex deed of trust has a balance of $3,435,315 and becomes due in 1997. HUD also approved a third deed of trust held by Jim Woodson and Denny McLarry. The Woodson and McLarry deed of trust has a balance of $1,334,871 and is due upon demand. Before Capital West filed this case, Woodson and McLarry paid $351,610 to Trilex to cure outstanding defaults.

The plan modified Reilly's promissory note by eliminating both the mortgage insurance requirement and the surplus cash provisions in the Regulatory Agreement. Reilly claimed that the modifications were unfair because the new note deprived Reilly of the value of its claim.

At the confirmation hearing, Reilly and The Mortgage Bankers Association of America objected to the plan on the ground that the proposed plan undermined the federal housing insurance program because it eliminated the payment of mortgage insurance premiums. HUD deposits all mortgage insurance premiums into a general insurance fund out of which all lenders' claims are paid. Reilly and MBAA argued that the ramifications of this plan would be to frustrate the

National Housing Act, to increase the amount of down payments required to obtain home loans, to deplete the funds HUD reserves to pay lenders, and to debilitate the secondary mortgage market.

On reconsideration, the Assistant Secretary for Housing—Federal Housing Commissioner of the United States Department of Housing and Urban Development, Nicolas Retsinas, echoed these concerns in his declaration filed with the Court and asserted that the proposed modifications are contrary to the purposes of The National Housing Act. He states that the Regulatory Agreement between the borrower and the Secretary is an independent contract, and that "low and moderate income and displaced families … are the *incidental beneficiaries* of the National Housing Act." (emphasis added).

With respect to elimination of the mortgage insurance provision, Mr. Retsinas declares that the result will be a lack of confidence within the investment community which will reduce the flow of private investment capital which, in turn, will lead to a decrease in the availability of low and moderate income housing. Mr. Retsinas also states that elimination of the mortgage insurance requirement will adversely affect the Government National Mortgage Association (GNMA), which will face higher expenditures in covering the costs of retiring mortgage-backed securities. With respect to elimination of the surplus cash provisions, Mr. Retsinas declares that HUD will be unable to ensure the suitable maintenance of the housing project.

Capital West's response is that Reilly is not entitled to the insurance payments under any provision of 11 U.S.C. § 1129 [1] and that the plan actually promotes the purposes of the National Housing Act. Additionally, Capital West argues that allowing it to eliminate the payment of mortgage insurance would not impair Reilly or the home loan market generally because the provisions of the Bankruptcy Code include provisions which adequately protect lenders. Finally, Capital West asserts that predictions of

chaos in the secondary mortgage market are unjustified.

## ISSUES

1. Whether the plan provides Reilly with the full value of its secured claim as required by § 506(b).

2. Whether the plan provides "at least the allowed amount of [Reilly's] claim" defined as "at least the value of [Reilly's] interest in the estate's interest" in the real property as required by § 1129(b)(2)(A)(i), or alternatively, the indubitable equivalent of Reilly's claim as required by § 1129(b)(2)(A)(iii).

3. Whether the modifications to Reilly's note conflict with the requirements of the National Housing Act in violation of § 1129(a)(3).

## DISCUSSION

1. **Capital West's Plan Is Confirmable Since It Provides Reilly With The Full Value Of Its Claim.**

■ The first issue the Court must resolve is whether the value of Reilly's secured claim includes the cost of insurance required by the original note. Reilly contends that it is entitled to "any reasonable fees, costs, or charges provided for under the agreement under which such claim arose." 11 U.S.C. § 506(b). Reilly argues that since the insurance payments are charges described in the loan documents themselves, the payments are part of Reilly's secured claim. Reilly and MBAA complain that if the note does not maintain the benefit of mortgage insurance, the note becomes less valuable in the secondary mortgage market.

Capital West concedes that any charge for mortgage insurance accrued to the date of confirmation is a valid claim but asserts that thereafter the plan modifies the note to eliminate the requirement for mortgage insurance. There is no disagreement that for purposes of the reorganization plan, the value of the collateral is determined at the time the plan is confirmed. *In re Ahlers*, 794 F.2d 388, 398, *rev'd on other grounds, Norwest*

---

1. All further references are to the Bankruptcy Code, 11 U.S.C. §§ 101 et seq., unless otherwise

noted.

*Bank Worthington v. Ahlers,* 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988).

The Ninth Circuit has held that the value of an undersecured creditor's claim does not include mortgage insurance. *Lomas Mortg. USA v. Wiese,* 980 F.2d 1279, 1283 (9th Cir. 1992), *overruled on other grounds, Nobelman v. American Sav. Bank,* — U.S. —, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993). In *Lomas,* the debtor obtained a loan from Federal National Mortgage Association (FNMA) secured by both a deed of trust and private mortgage insurance. In confirming the debtor's Chapter 13 plan, the court held that the value of FNMA's claim under § 506(a) did not include mortgage insurance payments. Although *Lomas* considered the value of the claim of an undersecured creditor, the court specifically noted that it "is not required to afford protection with respect to the creditor's contractual rights against third parties." *Lomas,* 980 F.2d at 1283; *In re Fischer,* 136 B.R. 819, 828 (Bankr.D.Alaska 1992) ("[A]greements between the creditor and third parties should not affect the valuation of the subject property."); *In re Lopez,* 75 B.R. 961 (Bankr.E.D.Pa.1987), *aff'd,* 82 B.R. 712 (Bankr.E.D.Pa.1988) (proper valuation did not include consideration of mortgage insurance); *Grubbs v. Nat'l Bank of South Carolina,* 114 B.R. 450, 452 (D.S.C.1990) ("The availability ... of recourse against third parties with respect to the claim should not affect the value attributed to the property.").

The reasoning of *Lomas* remains equally viable *vis a vis* the claim of an oversecured creditor. Reilly's contractual rights as a third party beneficiary of HUD's agreement with Capital West are not protected by the Bankruptcy Code. The result is that the value of Reilly's claim is determined as of the date of confirmation without taking into account any enhancement to value provided by the mortgage insurance.

### 2. The Plan Is Confirmable Under Fair And Equitable Standards Since It Provides Reilly The Value of Its Interest In The Estate's Interest As Well As The Indubitable Equivalent Of Its Claim.

■ A reorganization plan may not be confirmed over the objection of an impaired class unless the plan is "fair and equitable." 11 U.S.C. § 1129(b). For this plan to be "fair and equitable," the secured creditor must either retain its lien and receive deferred cash payments equal to the value of its claim, or collect the "indubitable equivalent" of its claim. *See* 11 U.S.C. § 1129(b)(2)(A)(i) and (iii). In either instance, § 1129 requires that the creditor be both completely compensated for the present value of its claim and also assured that its claim is secured. *See In re American Mariner Industries,* 734 F.2d 426, 433 (9th Cir. 1984) (explaining that the "indubitable equivalent" of a claim must provide the claim's present value and insure the safety of the principal).

A case comparable to the matter *sub judice* is *In re Roberts Rocky Mountain Equipment Co., Inc.,* 76 B.R. 784, 791 (Bankr. D.Mont.1987). There, the court confirmed a plan which eliminated corporate life insurance payments pledged to the United States Small Business Administration (SBA). The SBA objected to confirmation on the ground that elimination of the monthly insurance payments would substantially erode its security. The court found that the SBA was fully secured, even without the insurance policy, because the assets securing the SBA lien exceeded the balance of the loan. Consequently, the court reasoned that the plan met the requirements of § 1129(b)(2)(A)(i) and, therefore, could be confirmed. The court noted that elimination of the policy had the positive effect of reducing the debtor's expenses by $4,000 each month which increased the likelihood of a successful reorganization.

■ The plan in the case at bar, similarly, meets the requirements for confirmation under § 1129(b)(2)(A)(i). First, under the plan Reilly retains a lien securing the amount of its allowed claim. Reilly's loan remains fully secured without mortgage insurance. In fact, Reilly is oversecured given that the fair market value of the property securing Reilly's lien is $7 to $9 million and the value of the lien is approximately $2.63 million. Second, the plan provides that Reilly will receive

deferred cash payments having a present value, as of the effective date of the plan, equal to the present value of the collateral. Accordingly, Reilly retains under the plan not less than it would receive if Capital West's collateral were liquidated under Chapter 7.

■ In the alternative, the plan also meets the requirement for confirmation under § 1129(b)(2)(A)(iii) where "indubitable equivalence" is the standard. In applying § 1129(b)(2)(A)(iii), the Bankruptcy Appellate Panel for the Ninth Circuit has held that the indubitable equivalent exists where it is unlikely that a claim would ever become even partially unsecured, where the plan was not speculative and provided safeguards and fair interest rates. *In re Pine Mountain, Ltd.*, 80 B.R. 171, 174–75 (9th Cir. BAP 1987).

The plan in the case at hand satisfies the requirements set forth in *Pine Mountain* for confirmation under § 1129(b)(2)(A)(iii). First, it is unlikely that Reilly's claim would ever become partially unsecured. Capital West's assets support Reilly's loan with substantial equity; the present value of the property exceeds the balance of Reilly's note by approximately $4 to $6 million. Second, the plan is not speculative and provides safeguards. The plan is feasible as demonstrated by Capital West's forecasts. Further, Reilly enjoys a senior position followed by junior financing determined to safeguard their own positions. Third, the evidence at confirmation supported the appropriateness of maintaining interest to Reilly at the original contract rate.

The protections provided the secured creditors' interests, including those of Reilly, lead the Court to conclude that Capital West's plan of reorganization as a going concern "satisfies the letter and spirit of the Bankruptcy Code." *See In re Roberts Rocky Mountain Equipment Co., Inc.*, 76 B.R. at 791. With respect to Reilly, the plan is fair and equitable because it satisfies both the value requirement of § 1129(b)(2)(A)(i) and the indubitable equivalence requirement of § 1129(b)(2)(A)(iii).

### 3. Plan Confirmation Is In Accord With The Goals Of Both Chapter 11 And The Federal Housing Act.

■ Finally, the plan must not be proposed by any means forbidden by law. Confronted with two governing statutes, the Court must attempt to reconcile the policies and goals of each statute. *National Labor Relations Board v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). Specifically, the Court must determine whether the plan conflicts with the National Housing Act because of the provisions eliminating mortgage insurance payments and surplus cash requirements. In order to assess whether Chapter 11 of the Bankruptcy Code conflicts with the National Housing Act under the circumstances of this case, the Court reviews the goals and objectives of each statute.

### A. The Goal Of Chapter 11 Of The Bankruptcy Code Is To Increase Return To Creditors By Enabling Debtors To Reorganize.

■ The Supreme Court has recognized that Chapter 11 has two major objectives. First, it permits the successful rehabilitation of the debtor. *Bildisco*, 465 U.S. at 527, 104 S.Ct. at 1196. By preventing a Chapter 7 liquidation, Chapter 11 allows the debtor to "continue to provide jobs, to satisfy creditors' claims, and to produce a return for its owners," all of which are beneficial to the economy as a whole. *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 203, 103 S.Ct. 2309, 2312, 76 L.Ed.2d 515 (1983). Secondly, "Chapter 11 ... embodies the general Code policy of maximizing the value of the bankruptcy estate." *Toibb v. Radloff*, 501 U.S. 157, 163, 111 S.Ct. 2197, 2201, 115 L.Ed.2d 145 (1991).

In pursuit of the goals of Chapter 11, the Bankruptcy Code alters the rules governing the non-bankruptcy relationships between a debtor and its creditors. *In re Medicar Ambulance Co., Inc.*, 166 B.R. 918, 924 (Bankr.N.D.Cal.1994); Thomas H. Jackson, *Logic and Limits of Bankruptcy Law* (1986). Courts have held that government interests are accorded the same status as private creditors under the Bankruptcy Code. *See In re*

*Davenport,* 153 B.R. 551 (9th Cir. BAP 1993) (chapter 12 plan may provide for forced redemption of debtor's land bank stock contrary to provision of Farm Credit Act), *opinion vacated,* 40 F.3d 298 (9th Cir.1994) (vacating opinion of Bankruptcy Appellate Panel based on mootness of appeal resulting from voluntary dismissal of underlying bankruptcy case); *In re Buttonwood Partners, Ltd.,* 111 B.R. 57 (Bankr.S.D.N.Y.1990) (confirming the debtor's plan despite the possible violation of the Financial Institutions Reform, Recovery and Enforcement Act); *In re Water Gap Village,* 59 B.R. 23 (Bankr.D.N.J. 1985) (HUD was subject to "cram down").

**B.  The Goal Of The National Housing Act, To Provide Affordable Housing, Is Accomplished Not Only By Insuring Lenders But Also By Finding Alternate Methods Of Financing To Prevent Foreclosure.**

Congress' goal in enacting the National Housing Act was to provide a "decent home and suitable living environment for every American family." *Beck Park Apartments v. U.S. Department of Housing,* 695 F.2d 366, 368 (9th Cir.1982). To accomplish this goal, Congress provides programs designed "to assist private industry in providing housing for low and moderate income families and displaced families." *Id.* However, HUD is under a duty to act in a manner consistent with the objectives and priorities of the Act. 42 U.S.C. § 1441; *Portela v. Pierce,* 650 F.2d 210, 211 (9th Cir.1981).

One way in which HUD accomplishes Congress' goal is by motivating lenders to loan money. HUD motivates lenders by both insuring that the loan will be repaid if the borrower defaults and by restricting the borrower's activities in ways that protect the lender. *See* 12 U.S.C. § 1715z–1; *Little Earth of the United Tribes, Inc. v. United States Department of Housing and Urban Development,* 807 F.2d 1433, 1435 n. 2 (8th Cir.1986). Congress also furthers its goal of providing affordable housing by requiring HUD to assist private industry in efforts to avoid foreclosure.

In furtherance of the goal of providing decent homes, HUD is under a statutory obligation to consider alternate methods of financing in cases where insisting on the original payment plan increases the borrower's risk of foreclosure. *United States v. American Nat'l Bank,* 443 F.Supp. 167 (N.D.Ill.1977). HUD "has a statutory obligation to take action to prevent foreclosures by applying alternative methods of financing in appropriate cases." *Id.* at 175; *Russell v. Landrieu,* 621 F.2d 1037, 1041–42 (1980) (in foreclosing on property HUD could not act only to obtain maximum financial return but had to consider and implement alternatives to foreclosure which would effectuate the policy objectives of the National Housing Act); *Kent Farms Co. v. Hills,* 417 F.Supp. 297, 301 (D.D.C.1976) (before HUD forecloses on a project "it must consider national housing policy and decide what further steps authorized by Congress it will take to assure continuity of the decent, safe, sanitary, low-cost housing then being provided."). Alternatives authorized by HUD regulations include modification, extension, or refinancing of a mortgage. *American Nat'l Bank,* 443 F.Supp. at 175; *see also* 24 C.F.R. §§ 203.340, 203.342 and 207.256(b) (1994).

**C.  Plan Confirmation Preserves The Concerns Of Both Chapter 11 And The Federal Housing Act.**

Chapter 11 of the Bankruptcy Code is fundamentally concerned with enabling debtors to reorganize; the Federal Housing Act is fundamentally concerned with providing affordable housing. When attempting to harmonize the policies and goals of two competing statutes, the Court must respect the fundamental concerns of each.

In confirming Capital West's plan, the Court preserves the goals and concerns of both Chapter 11 and the Federal Housing Act. Chapter 11 goals are satisfied because elimination of the mortgage insurance payment provides additional capital for maintaining the property. Elimination of the surplus cash restrictions enables Capital West to structure repayment as contemplated by its plan. The elimination of these provisions

affords Capital West the best possible chance to successfully reorganize.

The plan is also consistent with the Federal Housing Act. The arguments made in opposition of the plan regarding the negative effect on HUD's programs and the secondary mortgage market ignore the fact that the fundamental goal of the Act is to provide affordable housing. Low and moderate income and displaced families are not the "incidental beneficiaries of the National Housing Act" as declared by Mr. Retsinas, but the primary beneficiaries. Any negative effect on the secondary mortgage market is outweighed by the benefit of providing affordable housing. To deny affordable housing on the basis that insurance premiums are not paid where the lender's interests are otherwise adequately protected is not reasonable. To deny affordable housing on the basis that surplus cash be reserved for maintenance is also not reasonable under the circumstances of this case.

Congress, in enacting the Federal Housing Act, did not compromise the provisions of Chapter 11 of the Bankruptcy Code. Although Congress has carved out exceptions to the Bankruptcy Code in order to protect various national policies, it has not done so here. There is no indication that Congress intended to deny the full range of possibilities Chapter 11 provides to debtors with HUD loans. If Capital West were to suffer foreclosure, the purposes of both Chapter 11 and the Federal Housing Act would be frustrated, while confirmation of Capital West's plan promotes the fundamental goals and objectives of each statute.

## CONCLUSION

The plan before the Court satisfies the requirements for confirmation in that it is fair and equitable and is not proposed by any means forbidden by law, but rather promotes the fundamental concerns of both the National Housing Act and the Bankruptcy Code.